## PEOPLE v. COATES.

1. Criminal Law—Plea of Guilty—Pre-Sentence Investigation.
   The investigation which a trial judge is required to make before
   sentencing an accused in order to determine whether plea of
   guilty to an information was freely made, with full knowledge
   of the nature of the accusation and without undue influence,
   need not be made by a private examination, the validity of the
   sentence not being dependent upon the particular manner in
   which the judge proceeded to satisfy himself of the voluntary
   character of the plea of guilty (CL 1948, § 768.35).

2. Same—Plea of Guilty.
   A defendant in a criminal prosecution has a right to plead guilty.

3. Same—Plea of Guilty—Sentence.
   The effect of a plea of guilty is to authorize the imposition of the
   sentence prescribed by law of a crime sufficiently charged,
   where the plea is entirely voluntary by one competent to know
   the consequences and not induced by fear, misapprehension,
   persuasion, promises, inadvertence, or ignorance (CL 1948,
   § 768.35).

4. Same—Sentence—Plea of Guilty—Investigation—Time.
   Sentences of life imprisonment after pleas of guilty to robbery
   armed and rape were not invalid because trial judge made at
   least a part of his investigation to determine whether or not
   such plea was voluntarily and knowingly made before the plea
   was made and the balance thereafter in open court, where
   circumstances were such that trial court knew or had reason

---

References for Points in Headnotes
[1, 4, 5, 10] 14 Am Jur, Criminal Law §§ 270, 271.
[2] 14 Am Jur, Criminal Law § 269.
[3, 10] 14 Am Jur, Criminal Law § 272.
[6, 7, 10] 12 Am Jur, Constitutional Law § 607 et seq.
[8, 9] 14 Am Jur, Criminal Law §§ 17, 118, 167 et seq.
[8, 9] Plea of guilty without advice of counsel. 149 ALR 1403.

to believe defendant intended to plead guilty, the time when the investigation is conducted being of lesser importance than the thoroughness of it in ascertaining whether defendant understood the nature of the crime and the consequences of such plea (CL 1948, § 768.35).

5. SAME—PLEAS OF GUILTY.

Defendant's pleas of guilty to charges of robbery armed and rape *held*, under record presented, to have been made voluntarily and with knowledge of the consequences (CL 1948, § 768.35).

6. CONSTITUTIONAL LAW—DUE PROCESS.

Due process is the guarantee of rights essential to a fair hearing under the Federal Constitution (US Const, am 14).

7. SAME—DUE PROCESS.

The test to be applied in every case wherein a denial of due process is brought into question depends upon the established facts in the case (US Const, am 14).

8. CRIMINAL LAW—DUE PROCESS—APPOINTMENT OF COUNSEL.

The trial court's failure to appoint counsel for 25-year-old defendant, charged with robbery armed and rape, did not deprive such defendant of any of the elements of due process, where defendant was already much experienced in crime, waived examination before the examining magistrate, expressed a desire to plead guilty and "get it over with" and did not ask trial judge for counsel (US Const, am 14).

9. SAME—PLEA OF GUILTY—ADVICE OF COUNSEL.

It must be shown that an ingredient of unfairness actively operated in the process that resulted in confinement of one accused of crime because of lack of benefit of counsel in order to invalidate a plea of guilty (CL 1948, § 768.35).

10. SAME—DUE PROCESS—QUICK JUSTICE—PLEA OF GUILTY.

Fact that defendant was taken into custody between 12:30 a.m. and 2 a.m. on second day following commission of robbery armed and rape, taken before a circuit court between 3 and 3:30 a.m., plea of guilty accepted, investigation by the circuit judge conducted and sentence to life imprisonment imposed by 5:30 a.m. did not constitute a denial of due process by reason of proceeding at such time of day, although generally such time for holding court is not approved (US Const, am 14).

ADAMS, BUTZEL and BUSHNELL, JJ., dissenting.

Appeal from Genesee; Bishop (Clifford A.), J. Submitted April 16, 1953. (Docket No. 62, Calendar No. 44,011.) Decided June 8, 1953.

Irving Coates pleaded guilty to robbery armed and rape. Motions for new trial made and denied. Defendant apeals. Affirmed.

*C. Rees Dean,* for appellant.

*Frank G. Millard,* Attorney General, and *Chester R. Schwesinger,* Prosecuting Attorney, and *Robert A. Grimes, Jr.,* Assistant Prosecuting Attorney, for the people.

SHARPE, J. Defendant, Irving Coates, upon his plea of guilty to the crime of robbery armed and the crime of rape, was sentenced to life imprisonment on each information. The record shows that on the 25th day of February, 1929, a complaint was made to the police of Flint, Michigan, that a Joe Bellinger had been robbed and that Mrs. Bellinger had been raped by an armed man. On February 27, 1929, between the hours of 12:30 a.m. and 2 a.m., defendant, Irving Coates, was taken into custody. Shortly after being taken into custody, defendant, Irving Coates, indicated his desire to plead guilty to both charges. About this time Mr. and Mrs. Bellinger were called in and they identified defendant as the person who had attacked them. Following his identification, arrangements were made for his arraignment before a municipal judge of the city of Flint. At this time the prosecuting attorney and chief of police concluded to call Circuit Judge Black in for consultation in view of the fact that defendant indicated his willingness to get the matter over with. Defendant was then taken to the circuit court to appear before Judge Black. He arrived at the circuit

court between 3 and 3:30 a.m., and was taken into the chambers of Judge Black where he remained for a period of time estimated to be from 20 minutes to an hour or more. Following the conference with Judge Black defendant was returned to the courtroom whereupon the following proceedings were had:

"The above entitled cause came on before the Honorable Edward D. Black, circuit court judge for Genesee county, Michigan, for arraignment of the above named respondent-appellant on charges of rape and robbery armed, on the 27th day of February, 1929. The plaintiff was represented by C. D. Beagle, prosecuting attorney for the county of Genesee, Michigan. The respondent-appellant was brought before the court without counsel.

"The following proceedings were had at 5:30 a.m., on said day:

"*Mr. Beagle* (To respondent):

"*Q.* Your name is Irving Coates?

"*A.* Yes, sir.

"*Q.* You are charged in this information filed in this court on the 25th day of February this year, in this county, being armed with a dangerous weapon, to-wit; a claw hammer, you did feloniously assault Joe Bellinger with intent to rob and steal contrary to the form of the statute in such case made and provided and against the peace and dignity of the people of the State of Michigan. And, heretofore, to-wit; at the said time and place, being armed with a dangerous weapon; to wit; a claw hammer, did assault him, the said Joe Bellinger and feloniously took from his person $13 in lawful money of the United States, with intent to kill or maim him, the said Joe Bellinger, if resisted, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the people of the State of Michigan. Are you guilty or not guilty of that charge?

"*A.* Guilty.

"*The Court:* You plead guilty of your own free will?

"*A.* Yes, sir.

"*Q.* Without any promises made by anybody?

"*A.* Yes, sir.

"*Q.* Or any threats from anybody?

"*A.* Yes, sir.

"*Q.* How old are you?

"*A.* 25.

"*Q.* How long have you lived in Flint?

"*A.* 12 years.

"*Q.* Ever been arrested before?

"*A.* Yes, sir.

"*Q.* What for?

"*A.* Breaking and entering, larceny from the person.

"*Q.* Those are the only 2 times?

"*A.* No more than on assault and battery charges.

"*Q.* Are those the only felonies?

"*A.* Just 1 felony.

"*Mr. Beagle:*

"*Q.* You were arrested on the charge of rape here, weren't you, and it was dismissed?

"*A.* Dismissed.

"*The Court:*

"*Q.* Are you a married man?

"*A.* No, sir.

"*Q.* I have been informed that you have admitted some robberies outside of the ones you are charged with here, that you have been arrested for. Is that true?

"*A.* Yes, sir.

"*Q.* How many would you say?

"*A.* 7 or 8 at least.

"*Q.* That is 8 on the street?

"*A.* On the street.

"*Q.* Men or women or both?

"*A.* Men.

"*Q.* Did you carry a gun with you?

"*A.* Only the first night—tonight is the first time I had a gun, tonight.

"*Q.* You say you had a gun tonight?

"*A.* Yes, sir.

"*Q.* This was last night this complaint was made against you—night before last, the 25th. You say you had a gun tonight with you?

"*A.* Yes.

"*Q.* Did you hold up somebody tonight?

"*A.* Yes, sir.

"*Q.* Who did you hold up tonight, man or woman?

"*A.* Man.

"*Q.* Whereabouts?

"*A.* Philadelphia street.

"*Q.* Philadelphia street, did you get anything?

"*A.* No, sir

"*Q.* Why not?

"*A.* He didn't have anything.

"*Q.* You had a gun with you that night when you held him up?

"*A.* No, sir.

"*Q.* I thought you said you had a gun tonight.

"*A.* I had a hammer at that time.

"*Q.* What?

"*A.* I didn't have a gun at that time.

"*Q.* When did you have a gun? I thought you said you had a gun tonight?

"*A.* I got the gun after that.

"*Q.* You intended to hold up somebody else yet tonight?

"*A.* Yes, sir.

"*Q.* Do you work?

"*A.* I was working.

"*Q.* You did not need this money did you?

"*A.* Not particularly.

"*Q.* Do your people live here?

"*A.* Yes, sir.

"*Q.* How long since you first commenced your criminal career, how many years ago?

"*A.* Not years.

"*Q.* Less than a year?

"*A.* Yes, sir.

"*Q.* It has all been done within the last year or 2?

"*A.* Yes, sir.

"*Q.* You served time?

"*A.* Yes, sir.

"*Q.* What for?

"*A.* Larceny from a person.

"*Q.* Larceny from a person?

"*A.* Yes, sir.

"*Q.* Only 28 years old, you say?

"*A.* 25.   *   *   *

"*Q.* Where have you been staying, at home?

"*A.* No, sir, I live at 506 Baltimore.

"*Q.* Who lives there?

"*A.* A man and his wife.

"*Q.* Are those colored people too?

"*A.* Yes, sir.

"*Q.* (To Inspector Burke): Did you find him at a colored place?

"*Inspector Burke:* No, he was in a white place.

"*Q.* Whose place were you in when they caught you?

"*A.* Jack Dining's place.

"*Q.* What does he do?

"*A.* I don't know what kind of work he does.

"*Q.* How did you come to be there?

"*A.* I know him.

"*Q.* Is he a crook, too?

"*A.* He is not a crook.

"*Q.* Has he been out with you?

"*A.* No, he has not been out with me.

"*Q.* He does not know what you have done?

"*A.* He knows.

"*Q.* He knew you had been robbing?

"*A.* He gave me a pistol tonight.

"*Inspector Burke:* At the time he was arrested he had in his possession a 45-caliber army automatic. At the time we entered the house he threw the pistol in some clothing in a bedroom. He also stated to me this Dining gave him this pistol with the understanding he was to go out and hold up people and go 50-50 with him on the holdups.

"*The Court:*

"*Q.* This is true?

"*A.* Yes, sir.

"*Q.* Had you ever divided with him before?

"*A.* No, sir.

"*Q.* But he knew you were doing that work?

"*A.* Yes, sir.

"*Q.* How long have you known him?

"*A.* 8 or 9 years.

"*The Court:* Rape carries a life sentence, doesn't it, Mr. Prosecutor?

"*Mr. Beagle:* Sir?

"*The Court:* The offense of rape carries a life sentence?

"*Mr. Beagle:* Yes, and robbery armed.

"*The Court:*

"*Q.* You plead guilty to 2 offenses carrying a life sentence and you are only 25 years old. Can you tell the court why you started out that way?

"*A.* Yes, sir.

"*Q.* Do you drink?

"*A.* Yes, sir.

"*Q.* That is what did it?

"*A.* Cocaine too.

"*Q.* Where did you get your cocaine?

"*A.* Bought it on the next street where I live at of a boy.

"*Q.* Who is the boy?

"*A.* Richard, a fellow named Richard; I don't know his first name.

"*Q.* A colored boy?

"*A.* Yes.

"*Q.* Do you know where he gets it?

"*A.* Detroit.

"*Q.* What number does he live at?

"*A.* I don't know the number, it is the first house off of Horton, on Philadelphia.

"*Q.* I suppose you can get your liquor anywhere, or do you have any special place to get it?

"*A.* I get it there.

"*Q.* Of the same fellow?

"*A.* Yes, sir.

"*Q.* How much do you have to pay for it?

"*A.* The liquor?

"*Q.* Yes.

"*A.* 50 cents.

"*Q.* Don't you buy more than half a pint at a time?

"*A.* Sometimes a pint.

"*Q.* How much do you have to pay for cocaine?

"*A.* A dollar.

"*Q.* You shoot yourself with cocaine before you start out to rob?

"*A.* Don't shoot it, put it up my nose.

"*Q.* Put it up your nose before you start out?

"*A.* Yes.

"*Q.* Drink besides before you start?

"*A.* Yes, sir.

"*Q.* You get a double shot before you start out?

"*A.* Yes, sir. * * *

"*Q.* You do not think there is anything I can do but to put you away for life? You think that is what you are entitled to, don't you?

"*A.* Yes, sir.

"*Q.* It is a pretty hard blow for a boy 25 years of age?

"*A.* Yes, sir.

"*The Court:* Well, the sentence of the court is that you go to the State's Prison at Marquette for and during your natural life.

"*A.* All right, sir.

"*Q.* Is that satisfactory?

"*A.* Yes, sir.

"*Mr. Beagle:* In each case?

"*The Court:* In each case."

In August, 1947, defendant filed 2 motions for leave to file motions for a new trial in each case. In an affidavit supporting his motions he states:

"Deponent further says that he was arrested by police, including Chief C. J. Scavarda and Sergeant Beale, who threatened him with bodily harm and

death if your deponent did not plead guilty to the charges asserted against him, and that based upon his fears, deponent did plead guilty of the crime of which he now stands convicted in this court, but deponent denies now as he has steadfastly denied from the moment of his arrest, that he is guilty of any crime, and especially the crime of which he now stands convicted and that if he had not been coerced into pleading guilty, he would have been able to show that he could not have, nor did commit the said crime.

"Deponent further says that from the time of his arrest through the time when he was committed to Marquette Prison, he was unable to communicate with friends, relatives, or secure counsel and that at no time was he asked whether he desired counsel, and he feared to ask for counsel because of the threats made against him by Chief C. J. Scavarda and Sergeant Beale, nor was he apprised by the court of the seriousness of the charge laid against him, nor the consequences of his plea, nor given any opportunity for rest, he from the time of said arrest through his conviction being tired, worn out, and being without sleep, was drowsy.

"Deponent further says that at the time of his sentence at 5:30 a.m., on February 27, 1929, the court at no time questioned him on the facts alleged in the information, and that the gist of the testimony was on extraneous matters, and that no witnesses testified against him nor were examined by the court, except an inspector of the police who was not sworn, and who stated facts which were not true, and which defendant was not given the opportunity to question by cross-examination.

"Deponent further says that he is advised that he had been deprived of the guaranty of due process of law as guaranteed by the United States Constitution and as guaranteed by the Michigan Constitution of 1908, and the statutes of the State of Michigan.

"Deponent further says that being without funds, he was unable for a great number of years to retain

the services of counsel and to secure copies of the records and proceedings in said cause, and that the same was not due to his culpable negligence, and that he is filing the attached motion after he had been able to secure the services of counsel, he previously having sought counsel for a number of years, but was turned down because of lack of funds."

The motions were treated by the trial court as a motion for a new trial in each case. Testimony was taken on September 23, 1947, including that of defendant. At the conclusion of all testimony the trial court denied the motions for a new trial.

Following these proceedings the attorney general filed a motion in the Supreme Court for the purpose of remanding the cause to the circuit court of Genesee county for further proceedings. On January 16, 1948, the Supreme Court granted the motion to remand and on May 25, 1948, further proceedings were had in the circuit court of Genesee county. At this hearing defendant testified:

"I asked Mr. Scavarda for counsel. * * * Threats were made by Sgt. Beales on the way down here, that was the first threat. * * * I was sitting in the rear of the car with Sgt. Beales. He said to me, 'What are you going to do?' I said 'Nothing.' He said, 'You could be dead.' * * * I came on down and plead guilt, but first I asked Lt. Campbell right in front of Scavarda could I have an attorney. They said no. * * * On a prior occasion I testified in court, denying my guilt in both cases. * * * I did not ask the police to get this over with as soon as possible. I had no time to insist on going to court following my arrest for the simple reason that they brought me out too quick. * * * I first knew the charges when I was sitting in the judge's room. I didn't know that I was being charged with rape and robbery prior to coming to court. * * * I requested an attorney from Chief Scavarda. * * *

"Q. What happened at 3:15?

"*A.* Well, I went in the judge's room, a little room back somewhere in here and stayed in there until around—well, it was pretty near 4:30 or quarter of 5. * * *

"*Q.* How many times have you been arrested and convicted? * * *

"*A.* I was convicted one time for breaking a man's jaw. * * * I went to prison the first time on grand larceny and received 1 to 10 years. I was arrested for assault and battery 4 or 5 times."

The people produced Caesar Scavarda, who testified:

"In the month of February, 1929, I was chief of police of the city of Flint. I recall the early morning of February 27, 1939. * * * Mr. Coates' position at that time, after being disarmed, or disarming himself and apprehended was very docile, he made a complete statement in reference to the offense and admitted his guilt, and declared his desire to get the thing over with as soon as possible. He wanted to go into court. We took advantage of the situation for the following reasons: The feeling in the community was naturally running at a high pitch because of the atrociousness of the offense, and, as long as he was willing to go in and plead guilty we thought we could get it over as soon as possible, we would call the prosecuting attorney and confer with Prosecutor Beagle, and the Honorable Circuit Court Judge Black. The judge's position in the matter was he was willing to expedite the matter under the conditions, with one reservation, that we use every case [care?] and caution as to due processes of law. A statement was taken at police headquarters by Inspector Burke. I was present part of the time when the statement was taken. Mr. Coates didn't request to see an attorney. The appearance of Coates was that of being definitely normal; he did not appear particularly sleepy nor frightened. Mr. Coates was not threatened with bodily harm or death. There

were no threats of violence in his presence or otherwise. * * *

"*Q.* Can you state whether at any time Mr. Coates mentioned being fearful of any lynching or mob violence?

"*A.* He did not.

"*Q.* You said Mr. Coates did not request an attorney from you?

"*A.* He did not. * * *

"*Q.* Did he at any time ask to see any friends or relatives?

"*A.* He did not.

"*Q.* Can you state whether at any time in your presence he ever denied his guilt?

"*A.* He did not. He freely and readily admitted his guilt, wanted to get the whole thing over with.

"There were no promises, inducements, or threats held out to him in order to have him plead guilty. I came up to the courthouse with Mr. Coates. He was brought directly from police headquarters to the courtroom. He arrived at the courthouse about 3 or 3:30 in the morning. The judge was already here in the courtroom when I arrived. Judge Black had Mr. Coates brought into his private chambers and was there for quite a period of time."

Lowell Burke testified:

"I was with the Flint police for 13 years and in February, 1929, I was inspector of detectives. I recall the case of People *vs.* Smoky Coates, which case was assigned to my division and I took part in the investigation. * * * He did not at any time deny committing the crime. There were no threats, promises, or inducements held out to Mr. Coates to make him make that statement. I remember him appearing before Justice Frank Cain. At that time the complaint was read to him following the taking of this statement the prosecuting attorney was there, and Cletus Bush, the justice court clerk, came down and was in justice court. This was after Mr. Coates had expressed a desire to get this matter over with.

I heard him say that. To the best of my recollection it was about 3 o'clock or after when Mr. Coates was brought up here to the circuit court. I was not in the courthouse any time that night. From the time I first apprehended Mr. Coates throughout any of the proceedings, no threats were made to him about blowing him in two; and no threats of any kind were made to induce him to plead guilty. He was not promised anything to my knowledge; I did not hear any promises, I am sure there were none.   *   *   *

"*Q.* Do you know why court was convened at that hour of the morning?

"*A.* Well, in a conference with the prosecuting attorney and the other officials, and talking it over, and Coates having wanted to get the thing over with, and taking into consideration the way people felt, and having had some experience at a prior time with mob violence, it was decided that the circuit judge would be interviewed as to what was the best thing to do, and it was for that reason, as I remember, it was for that reason that the circuit judge agreed to come to the courthouse and take care of the matter. I don't know of any other reason."

Arthur B. Beales testified:

"In February, 1929, I was employed by the State police.   *   *   *   I went with Inspector Burke of the Flint police and was there when Mr. Burke arrested him.   *   *   *   I was around when the statement was taken. There were no threats made to induce Mr. Coates to plead guilty. According to my knowledge, in my presence there were no promises made.   *   *   *   I did not hear Mr. Coates request an attorney."

At the conclusion of the hearing the trial court denied the motions for a new trial and in an opinion stated:

"From the evidence taken at the time of the hearing of the motion I am satisfied and find that defendant requested that the matter be disposed of as soon as possible and that this request of his was the

pricipal cause for the hearing at the night session of court. * * *

"Again the veracity of the witnesses comes into the case. Is it reasonable to believe that the defendant would be sitting in Judge Black's office for more than 20 minutes to an hour and a half and nothing be said or is it more logical to believe that he was in there alone for over an hour with Judge Black excepting as officers might be called in for questioning? Defendant admits he was in Judge Black's office alone for a short time; also under oath he testified that his testimony of September 23, 1947, in regard to when he was in Judge Black's office, is false. Here again, the officer who defendant claims was with him most of the time he was in Judge Black's office, cannot testify as his lips were sealed by death long before the defendant made this claim.

"From the evidence of the hearings I cannot help but find that the defendant's claim that Judge Black failed to ascertain from the defendant the circumstances which induced him to plead guilty is false.

"Defendant claims to be entitled to a new trial because he says Judge Black failed to explain the consequences of his plea of guilty and that the court failed to determine that the plea of guilty was freely and voluntarily made. As above stated, I find defendant was in Judge Black's office alone with the judge except as witnesses who died before the petition was filed except as common sense would show that Judge Black did talk with the defendant in his chambers. Especially is this true when you read the proceedings in Judge Black's court at the time of plea and sentence and see the number of direct questions Judge Black asked defendant to which his reply was, yes, sir, showing that Judge Black was familiar with the facts immediately after he and defendant left his office and how defendant corrected him in case the judge made a statement that defendant did not agree with. Also before sentence the judge stated, 'You pleaded guilty to 2 offenses carrying a life sentence and you are only 25 years old.' The

defendant was not a young boy unfamiliar with criminal laws and court procedure. Under his own statements, he served a term in the Detroit House of Correction after a jury trial and also a term in the branch prison at Marquette, besides several arrests and guilty pleas to assault and battery, and after serving these sentences it would be hard to believe that he did not know that under the law of the State of Michigan, he had a right to withdraw his plea of guilty at any time before sentence and his correction of Judge Black's statements, if they were not in accordance with defendant's knowledge of the facts, show that he was perfectly at home in a courtroom and not excited. * * *

"As shown in the above opinion, defendant was not a mere boy but was old for his age as far as crime goes and well familiar with the rights of respondents and the proceedings in criminal cases. He now claims that he was afraid to ask for an attorney, notwithstanding the fact that he was alone with Judge Black in his office for a considerable length of time and testified where he asked only 1 man. He asked for an attorney; that was Chief Caesar Scavarda:

" '*Q.* Now, Mr. Coates, did you at any time ask Judge Black for an attorney?

" '*A.* No, I did not.' * * *

"I am thoroughly convinced that this respondent deliberately awaited the time to come when death would seal the lips of many of the material witnesses in the case, until the complaining witnesses had disappeared and until the officers were off the force and scattered, to make this application, knowing that the court would have to turn him loose if granted a new trial and that would be the same as pardoning him.

"I cannot, from my examination of the case, including the testimony at both examinations, the files and records in the case which defendant made a part thereof, believe the testimony of this defendant, with all his interest at stake as against the sworn statements of the officers whom the good Lord

had seen fit to spare their lives until this time. I therefor, file these added reasons why I deny a new trial to the respondent."

Upon leave being granted defendant appeals and urges that the trial court erred in finding that Judge Black made a proper investigation respecting the nature of the case before sentencing defendants. The statute in question reads as follows:

"Whenever any person shall plead guilty to an information filed against him in any court, it shall be the duty of the judge of such court, before pronouncing judgment or sentence upon such plea, to become satisfied after such investigation as he may deem necessary for that purpose respecting the nature of the case, and the circumstances of such plea, that said plea was made freely, with full knowledge of the nature of the accusation, and without undue influence. And whenever said judge shall have reason to doubt the truth of such plea of guilty, it shall be his duty to vacate the same, direct a plea of not guilty to be entered and order a trial of the issue thus formed." (CL 1948, § 768.35 [Stat Ann § 28.1058])

Defendant urges that the court's investigation should have been made after a plea of guilty was entered. We have had numerous occasions to construe the above statute. In *Bayliss* v. *People,* 46 Mich 221, we held that the statute does not require that a private examination be made and that an investigation made in open court is not fatal. In *People* v. *Ferguson,* 48 Mich 41, 42, we said:

"Now the validity of a sentence does not require that it should appear of record in what particular manner the judge may have proceeded to satisfy himself that the prisoner acted knowingly and freely in pleading guilty."

In *Henning* v. *People,* 40 Mich 733, 735, the trial court conducted an investigation in advance of the plea of guilty. We there said:

"The judge returns in substance that he had repeated interviews with the prisoner's counsel and friends, and made full inquiry into the matter, and that the change of plea was made with every circumstance of fairness and deliberation, and that he became fully satisfied in advance that Henning's plea of guilty might be properly received; and that it was put in accordance with all the conditions which the statute was designed to require, and was voluntary and free from undue influence. The return is very full and satisfactory on this subject, and is here appended.
"The judge having been thus satisfied upon such full investigation, in exact accordance with the statute, no error was committed in imposing sentence, and the judgment must be affirmed."

See, also, *People* v. *Lepper,* 51 Mich 196.
In *People* v. *Williams,* 225 Mich 133, 139, we said:

"The statute does not require a private examination. There was no error in holding the examinations in open court. Neither was there error in considering the reports of the probation officers as to the nature of the cases and the histories of defendants, and the opinion that the defendants were not fit subjects to come within the provisions of the probation law."

In *People* v. *Merhige,* 212 Mich 601, 612, we quoted with approval from *Pope* v. *State,* 56 Fla 81 (47 So 487, 16 Ann Cas 972):

"In a criminal prosecution a defendant has a right to plead guilty; and the effect of such a plea is to authorize the imposition of the sentence prescribed by law upon a verdict of guilty of the crime sufficiently charged in the indictment or information.

"The plea should be entirely voluntary by one competent to know the consequences, and should not be induced by fear, misapprehension, persuasion, promises, inadvertence, or ignorance."

In *People* v. *Vester,* 309 Mich 409, 412, we said:

"We must assume that the trial court made a proper investigation of the nature of the case; and that the plea was freely made with full knowledge of the nature of the accusation and without undue influence as is required by 3 CL 1929, § 17328 (Stat Ann § 28.1058)."

We must assume that the trial court in sentencing defendant had in mind his duty relative to conducting an investigation as required by statute; moreover the trial court did conduct an investigation in open court after defendant pleaded guilty and before sentence. In our opinion an investigation may be conducted in advance where the trial court knows or has reason to believe that defendant intends to plead guilty. It is not the time when the investigation is conducted, but the thoroughness of it in ascertaining that a defendant understands the nature of the crime he is pleading guilty to and the consequences of such plea. In our opinion there was no error in the manner in which the investigation was conducted. See *In re Elliott,* 315 Mich 662.

Defendant also urges that his plea of guilty was not made with full knowledge of the nature of the accusation and without undue influence. This claim is largely based upon defendant's statement that he was threatened with bodily harm or death. "Chief Scavarda told me to get out and run so he could get to blow me in two." Sergeant Beales said to me, "You could be dead." Both of these charges were denied by the officers and thus it becomes a question of fact whether defendant's plea of guilty was made through fear and intimidation. The rec-

ord does not show what conversation was had between defendant and Judge Black, but during this period of time defendant had sufficient time and the opportunity to inform the judge of the threats which induced him to plead guilty.

We have no hesitation in holding that if such threats came to the attention of any circuit judge a plea of guilty would not be accepted. Moreover, defendant's answers to questions propounded by Judge Black in open court after his plea of guilty was made contradicts the claim he now makes. In our opinion defendant's plea of guilty was voluntarily made and with knowledge of the consequences.

It is also urged that defendant was not accorded due process of law within the meaning of Amendment 14, § 1 of the Constitution of the United States:

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

Due process is the guarantee of rights essential to a fair hearing under the Federal Constitution. See *DeMeerleer* v. *Michigan,* 329 US 663 (67 S Ct 596, 91 L ed 584). In *Foster* v. *Illinois,* 332 US 134 (67 S Ct 1716, 91 L ed 1955), the court had under consideration the application of the "due process clause." It was there said:

"After all, due process, 'itself a historical product,' *Jackman* v. *Rosenbaum Co.,* 260 US 22, 31 (43 S Ct 9, 67 L ed 107), is not to be turned into a destructive dogma in the administration of systems of criminal justice under which the States have lived not only

before the Fourteenth Amendment but for the 80 years since its adoption. It does not militate against respect for the deeply rooted systems of criminal justice in the States that such an abrupt innovation as recognition of the constitutional claim here made implies, would furnish opportunities hitherto uncontemplated for opening wide the prison doors of the land."

The test to be applied in every case wherein a denial of due process is brought into question depends upon the established facts in the case. See *Uveges* v. *Pennsylvania*, 335 US 437 (69 S Ct 437, 93 L ed 127).

In the case at bar the claim is made that defendant was not advised of his right to have counsel. Defendant now claims that before he pleaded guilty he asked the Chief of Police Scavarda for the opportunity of retaining counsel. This assertion is positively denied by Chief Scavarda. Defendant does not claim that he asked Judge Black for counsel. The record in this case clearly shows that defendant's request for counsel came about 18 years after he was committed to prison. We are not aware of any unusual circumstances which indicated a duty on the part of the court to appoint counsel for defendant. In this case defendant was 25 years of age, experienced in crime, waived examination before the examining magistrate and expressed a desire to plead guilty and "get it over with." Under such circumstances the failure of the court to appoint counsel did not deprive defendant of any of the elements of due process.

It is also urged that the predawn hour at which the proceedings were conducted and the circumstances surrounding these proceedings were not conducive to the calm and orderly administration of justice. In this connection, defendant relies upon *DeMeerleer* v. *Michigan, supra,* where the court said:

"Here a 17-year-old defendant confronted by a serious and complicated criminal charge, was hurried through unfamiliar legal proceedings without a word being said in his defense. At no time was assistance of counsel offered or mentioned to him, nor was he apprised of the consequences of his plea. Under the holdings of this court, petitioner was deprived of rights essential to a fair hearing under the Federal Constitution."

The facts in the case at bar are not similar to the facts in the *DeMeerleer Case* and in our opinion are not controlling. We think the facts in the case at bar are on a parity with the facts of *Quicksall* v. *Michigan,* 339 US 660 (70 S Ct 910, 94 L ed 1188). In that case defendant pleaded guilty to the charge of murder. At that time he was 44 years of age, of fairly keen intellect and experienced in crime. He was not represented by counsel and no showing was made that he intimated to the court a desire for counsel. In affirming the sentence the court said:

"We brought the case here out of a zealous regard for due observance of the safeguards of the Fourteenth Amendment in the enforcement of a State's penal code. 336 US 916 (69 S Ct 635, 93 L ed 1079). The record exacts the holding that the petitioner has failed to sustain the burden of proving such a disregard of fundamental fairness in the imposition of punishment by the State as alone would justify this court to invalidate the sentence by reason of the due process clause.

"Petitioner makes no claim that he did not know of his right to be assisted by counsel, see CL 1948, § 763.1 (Stat Ann § 28.854), and in view of his 'intelligence, his age, and his earlier experiences in court,' the Supreme Court of Michigan rejected the notion that he was not aware of his right to be represented by an attorney. 322 Mich 351 at page 355. * * * *Cf. Gryger* v. *Burke,* 334 US 728, 730 (68 S Ct 1256, 1257, 92 L ed 1683). * * *

"To invalidate a plea*of guilty the prisoner must establish that 'for want of benefit of counsel an ingredient of unfairness actively operated in the process that resulted in his confinement.' "

In our opinion defendant was not denied due process, and in coming to this conclusion we are not unmindful of the fact that the proceedings took place in the early hours of the morning. As a general proposition we do not approve of court proceeding at this time of day. Of primary importance is not the hour when the proceedings took place, but the legality of such proceedings.

Our examination of the record requires the conclusion that Coates freely and voluntarily pleaded guilty to both informations; that the trial court did not err in accepting his plea of guilty; that a proper examination of defendant was had as required by statute and that there was no denial of due process.

The judgments are affirmed.

DETHMERS, C. J., and CARR, BOYLES, and REID, JJ., concurred with SHARPE, J.

BUSHNELL, J. (*dissenting*). The important question is whether Coates was denied the protection of the Constitutional guaranties of due process. (Mich Const 1908, art 2, § 16; US Const, Am 14, § 1.)

An examination of the circumstances of the case and the acts of the police, prosecutor, examining magistrate and trial judge, as disclosed in the opinion proposed by Mr. Justice SHARPE, shows that the constitutional rights of Coates were not protected by the administrative and judicial officers concerned.

The views of the writer in this respect were expressed in *People* v. *Crandell*, 270 Mich 124, 130. Although in that case Crandell was only 15 years old and in the instant case Coates was a man 25 years

old, with a bad record, those views are, nevertheless, applicable here.

As said in *Quicksall* v. *Michigan*, 339 US 660 (70 S Ct 910, 94 L ed 1188):

"It is now settled that as to its administration of criminal justice, a State's duty to provide counsel, so far as the United States Constitution imposes it, is but one aspect of the comprehending guaranty of the due process clause of a fair hearing on an accusation, including adequate opportunity to meet it."

In that case the question of the "disregard of fundamental fairness in the imposition of punishment" was posed. Here, the same question is posed.

The court further said in the *Quicksall Case:*

"At least 'when a crime subject to capital punishment is not involved, each case depends on its own facts.' * * * To invalidate a plea of guilty the prisoner must establish that 'for want of benefit of counsel an ingredient of unfairness actively operated in the process that resulted in his confinement.' * * * Petitioner's claim that the consequences of his plea of guilty had been misrepresented was disbelieved by the tribunal especially qualified to sit in judgment upon its credibility."

In the *Quicksall Case* here, 322 Mich 351, 359, we said:

"In determining whether one convicted of crime has been denied his constitutional rights in the manner above indicated, it is necessary in each instance to give careful consideration to the factual background of the particular case."

The "factual background" of the instant case is comprehensively presented in the opinion proposed by my Brother Sharpe. Even a cursory reading of it requires the conclusion that judicial proceedings begun sometime after midnight and completed about

5:30 in the morning, do not satisfy the requirement of what we term "due process of law."

Mr. Justice Frankfurter pointed out in his dissenting opinion in *Sacher* v. *United States,* 343 US 1, 28 (72 S Ct 451, 96 L ed 717):

"Time out of mind this court has reversed convictions for the most heinous offenses, even though no doubt about the guilt of the defendants was entertained. It reversed because the mode by which guilt was established disregarded those standards of procedure which are so precious and so important for our society."

In a concurring opinion in *Joint Anti-Fascist Refugee Committee* v. *McGrath,* 341 US 123 (71 S Ct 624, 95 L ed 817) he said in part at page 162:

"The requirement of 'due process' is not a fair-weather or timid assurance. It must be respected in periods of calm and in times of trouble; it protects aliens as well as citizens. But 'due process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances. Expressing as it does in its ultimate analysis respect enforced by law for that feeling of just treatment which has been evolved through centuries of Anglo-American constitutional history and civilization, 'due process' cannot be imprisoned within the treacherous limits of any formula. Representing a profound attitude of fairness between man and man, and more particularly between the individual and government, 'due process' is compounded of history, reason, the past course of decisions, and stout confidence in the strength of the democratic faith which we profess. Due process is not a mechanical instrument. It is not a yardstick. It is a process. It is a delicate process of adjustment inescapably involving the exercise of judgment by those whom the Constitution entrusted with the unfolding of the process."

See authorities cited in the dissenting opinion in *People* v. *Crandell,* 270 Mich 124, beginning at page 130; *People* v. *DeMeerleer,* 313 Mich 548, reversed on certiorari in *DeMeerleer* v. *Michigan,* 329 US 663 (67 S Ct 596, 91 L ed 584) and authorities therein cited. See, also, *In the Matter of Sarah Way,* 41 Mich 299.

The judgment and sentence should be set aside and a new trial ordered.

ADAMS, J., concurred with BUSHNELL, J.

BUTZEL, J. (*dissenting*). I concur in Justice BUSH-NELL's opinion for reversal except in his reference to *People* v. *Crandell,* 270 Mich 124, where the facts were dissimilar to those here under consideration and where this Court was. unanimous for affirmance, except for Justice BUSHNELL's sole dissent. In the instant case, Justice SHARPE has stated what transpired both at the trial and on the motion for new trial. It might be added to Justice BUSHNELL's reasons for reversal that if the police officers and the various authorities were so afraid of mob violence, as was alleged, and ascribed that as the reason. for disposing of the case from arrest to conviction in the few hours before dawn, then the defendant would have had similar reason to fear such violence. Defendant was arrested between 12:30 a.m. and 2 a.m. He went through the form of a trial. The proceedings were over by 5:30 a.m. The judge was aroused from his sleep about 3 a.m. and came to the courthouse. Photographers took a group picture of the judge, numerous police officers, the mayor of Flint and defendant. The actions speak for themselves. It would be a sad commentary on law enforcement if such a procedure is necessary. Notwithstanding the unusual facts in the case, and placing full credence in the testimony of the police officers and the

stenographic record of what occurred, I do not believe that there was due process of law such as is vouchsafed by the Constitution of the United States and that of this State. It would create a bad precedent to go into the law books. In addition to the cases cited in Mr. Justice Bushnell's opinion, see *Powell* v. *Alabama,* 287 US 45 (53 S Ct 55; 77 L ed 158), in which the supreme court of the United States quoted with approval from *Commonwealth* v. *O'Keefe,* 298 Pa 169, 173 (148 A 73), as follows:

"A prompt and vigorous administration of the criminal law is commendable and we have no desire to clog the wheels of justice. What we here decide is that to force a defendant, charged with a serious misdemeanor, to trial within 5 hours of his arrest is not due process of law, regardless of the merits of the case."

The instant case was disposed of in even less than 5 hours after the arrest. The delay of almost 24 years in asking for a new trial defendant ascribes to lack of funds with which to pursue his legal remedies. In the meantime, he has been in prison. It is far better to grant him a new trial, even at the risk of not being able to obtain some witnesses at this late date, than to put our stamp of approval on the improper procedure as outlined.

The conviction should be reversed and defendant remanded to the custody of the sheriff for a new trial.