PEOPLE *v.* TAYLOR.

OPINION OF THE COURT.

1. CRIMINAL LAW—CONSTITUTIONAL LAW—DEFENDANT'S RIGHTS—
PLEA OF GUILTY—SEPARATE RECORD—WAIVER OF RIGHTS—VOLUN-
TARINESS.

United States Supreme Court holding, interpreting Federal
Rules of Criminal Procedure, that a criminal defendant has
a privilege against compulsory self-incrimination, a right to
a jury trial and a right to confront his accusers, all of which
may be waived by entering a plea of guilty provided a
record is made showing that the plea was voluntarily made
with an understanding of the nature of the charge and the
consequence of the plea, merely brings federal court practice
up to the standard already used in this state (Fed R Crim P,
11).

2. CRIMINAL LAW—PLEA OF GUILTY—APPEAL AND ERROR—GROUNDS
FOR REVERSAL.

Grounds for reversal on direct appeal from a conviction based
on a plea of guilty are (1) that the sentence below was not
rendered in accordance with the law, (2) that upon the record
before the trial judge at the time of sentencing the trial
court erred as a matter of law in pronouncing sentence upon
defendant, and (3) that upon the record before the trial
judge at the time the plea of guilty was accepted the trial
court abused its discretion in accepting the plea of guilty.

---

REFERENCES FOR POINTS IN HEADNOTES

[1–16, 19–21, 23–33] 21 Am Jur 2d, Criminal Law § 484 *et seq.*
5 Am Jur 2d, Appeal and Error § 867.
Court's duty to advise or admonish accused as to consequences
of plea of guilty, or to determine that he is advised thereof.
97 ALR2d 549.
[17] 4 Am Jur 2d, Appeal and Error § 397 *et seq.*
[18] 4 Am Jur 2d, Appeal and Error §§ 123, 124.
[22] 20 Am Jur 2d, Courts § 223 *et seq.*

(338)

3. CRIMINAL LAW—PLEA OF GUILTY—VOLUNTARINESS—APPEAL AND ERROR—DIRECT APPEAL—QUESTION OF FACT.

Direct appeal from a conviction based on a guilty plea is not the correct way to challenge the voluntariness of the plea, for whether or not the plea was voluntary is a question of fact which was never put in issue at the taking of the plea.

4. CRIMINAL LAW—PLEA OF GUILTY—VOLUNTARINESS—INQUIRY— QUASI-ADMINISTRATIVE FUNCTION.

The inquiry into and examination of the voluntariness of a guilty plea required by statute and court rule is a quasi-administrative function designed to protect unknowing defendants from their mistakes (MCLA § 768.35; GCR 1963, 785.3[2]).

5. CRIMINAL LAW—PLEA OF GUILTY—VOLUNTARINESS—INQUIRY— RES JUDICATA.

A court's quasi-administrative determination that it is reasonable to accept a plea of guilty does not make the question of voluntariness of the plea *res judicata*.

6. CRIMINAL LAW—PLEA OF GUILTY—APPEAL AND ERROR—TRUTH OF PLEA—QUESTION OF FACT.

A direct appeal from a plea-based conviction is not a proper vehicle to challenge the truth of the plea, for whether or not defendant is actually guilty is a question of fact and where both sides agree at the taking of the plea that the defendant is guilty, that fact cannot be litigated.

7. CRIMINAL LAW—PLEA OF GUILTY—DUTY OF JUDGE—TRUTH OF PLEA—VOLUNTARINESS.

The trial judge has a duty to satisfy himself both as to the truth of a guilty plea and as to the voluntariness of that plea.

8. CRIMINAL LAW—PLEA OF GUILTY—MOTIONS—NEW TRIAL.

Trial courts, on hearing of a motion for a new trial after a plea-based conviction, and appellate courts on review, must examine the allegations of the motion, the supporting affidavits, and the testimony offered upon hearing of the motion.

9. CRIMINAL LAW—PLEA OF GUILTY—CONVICTION—NEW TRIAL— GROUNDS—INVOLUNTARY PLEA—UNTRUE PLEA.

Grounds for granting a new trial to a defendant after a plea-based conviction are that the plea was not voluntary and that the plea was not true.

10. CRIMINAL LAW—PLEA OF GUILTY—VOLUNTARINESS—MOTIONS—NEW TRIAL—BURDEN OF PROOF.

> Defendant must bear the burden of proving by a preponderance of credible evidence that his plea of guilty was the product of fraud, duress or coercion or so devoid of understanding that the defendant was not afforded his full legal rights to successfully satisfy a trial court that a plea was involuntary on hearing of a motion for a new trial.

11. CRIMINAL LAW—PLEA OF GUILTY—TRUTH OF PLEA—EVIDENCE—VOLUNTARINESS—MOTIONS—NEW TRIAL.

> Evidence that a plea of guilty of a crime was not true may be taken on motion for a new trial, where it was alleged the plea resulting in conviction was not voluntary.

12. CRIMINAL LAW—PLEA OF GUILTY—TRUTH OF PLEA—PROOF—REASONABLE DOUBT—MOTIONS—NEW TRIAL.

> Defendant's motion for new trial and supporting affidavits and offers of proof must raise in the mind of the trial court an honest and reasonable doubt as to the defendant's guilt to prove a guilty plea was not true.

13. CRIMINAL LAW—PLEA OF GUILTY—MOTIONS—NEW TRIAL—VOLUNTARINESS—INNOCENCE.

> A defendant's plea of guilty of a crime need not be shown to be involuntary where a motion for a new trial is grounded upon innocence of defendant.

14. CRIMINAL LAW—PLEA OF GUILTY—MOTIONS—NEW TRIAL—NEWLY DISCOVERED EVIDENCE—DISCRETION.

> A plea-based conviction is not more sacrosanct than a conviction upon a jury's verdict, and in either case, a proper motion for a new trial based upon after-discovered evidence must appeal to the discretion of the trial court.

15. CRIMINAL LAW—PLEA OF GUILTY—RECORD—MOTIONS—NEW TRIAL.

> A recorded colloquy of guilty-plea taking will not be lightly disregarded on motion for a new trial, any more than would damaging admissions made from the witness stand in a contested trial.

16. CRIMINAL LAW—PLEA OF GUILTY—VOLUNTARINESS—TRUTH OF PLEA.

> A criminal defendant convicted after entering a guilty plea may attack both the voluntariness and the truth of his plea, alleging that he is innocent and that his plea was the product of coercion or fraud.

17. Appeal and Error—Record on Appeal—Enlarging the Record.

A record on appeal may not be enlarged *ex parte* by affidavits filed for the first time in the appellate court brief.

18. Appeal and Error—Motions—New Trial.

An appellate court, passing upon the propriety of a trial court's denial of a motion for a new trial, must view the motion through the eyes of the trial court.

19. Criminal Law—Plea of Guilty—Motions—New Trial—Affidavits.

The claim of defendant convicted on a plea of guilty of breaking and entering, that he could produce witnesses to prove beyond any questionable doubt that he did not break and enter, is not to be given much credence in the absence of testimonially-phrased affidavits from the mystery witnesses.

Separate Opinion.

Dethmers and Black, JJ.

20. Criminal Law—Plea of Guilty—Voluntariness—Courts—Federal Criminal Procedure—Precedent.

*Decision by the United States Supreme Court that a court should not accept a plea of guilty without first addressing the defendant personally and determining that the plea was voluntarily made with understanding of the nature of the charge and consequence of the plea applies only to criminal procedure in the Federal courts.*

21. Criminal Law — Plea of Guilty — Voluntariness — State Courts — Retroactive Application.

*The decision of the United States Supreme Court that it was error for a state trial judge to accept petitioner's guilty plea without an affirmative showing that it was intelligent and voluntary imposes additional duties upon state court trial judges when they arraign and sentence those charged with felonies, but does not apply retroactively to the states.*

22. Courts — Decisions — Prospective Application — Presumptions — Retroactive Application.

*It is presumed that a United States Supreme Court decision will apply prospectively, along with application to the case being decided, unless that court promptly indicates the decision is to apply retroactively.*

DISSENTING OPINION.

T. M. KAVANAGH, ADAMS, and T. G. KAVANAGH, JJ.

23. CRIMINAL LAW—PLEA OF GUILTY—VOLUNTARINESS—MAXIMUM SENTENCE—COURT RULES.

*Trial court's failure to inform defendant, who pleaded guilty to breaking and entering, of the maximum sentence was reversible error because this advice is necessary for the plea to be freely, understandingly and voluntarily made without undue influence, compulsion or duress, and without promise of leniency as required by court rule (GCR 1963, 785.3[2]).*

24. CRIMINAL LAW—PLEA OF GUILTY—VOLUNTARINESS.

*In accepting a plea of guilty to a criminal charge, the trial judge's duty is to make certain that one who offers to have his guilt determined without a trial knows what he is doing and does it freely.*

25. CRIMINAL LAW — PLEA OF GUILTY — VOLUNTARINESS — COURT RULES.

*Court rule requires that the court inform a defendant wishing to plead guilty of the nature of the accusation, the consequence of his plea and, as a condition of accepting the plea, requires an examination of the accused to ascertain that the plea was freely, understandingly and voluntarily made (GCR 1963, 785.3[2]).*

26. CRIMINAL LAW—PLEA OF GUILTY—ACCEPTANCE OF PLEA.

*Acceptance of guilty plea is not a ruling of law or finding of fact, but is a determination by the accepting court that accused freely, understandingly and voluntarily, without undue influence, compulsion or duress and without promise of leniency, waived his right to a trial and adversarial determination of guilt and voluntarily submitted himself to the court for punishment according to the law.*

27. CRIMINAL LAW—PLEA OF GUILTY—APPEAL AND ERROR—VOLUNTARINESS—KNOWLEDGE—RECORD.

*Appellate courts can only go by the trial court record in reviewing guilty pleas; therefore, if it can be said with reasonable certainty from an examination of the record that the accused knew what he was pleading guilty to and for all practical purposes what the result of the plea would be, it is safe to conclude that the accused voluntarily relinquished his rights.*

28. CRIMINAL LAW—PLEA OF GUILTY—VOLUNTARINESS—MAXIMUM
PENALTY.

It cannot reasonably be concluded that an accused understand-
ingly and freely pleaded guilty unless the record shows that
the accused was advised of the maximum penalty to which
his plea exposed him.

29. CRIMINAL LAW—PLEA OF GUILTY—CONSTITUTIONAL RIGHTS—
VOLUNTARINESS—DETERMINATION OF GUILT.

No formula or list of questions will guarantee against every
eventuality that can be raised in questioning a guilty plea;
however, to assure that accused was afforded all of his rights
as guaranteed by the Federal and State constitutions, statutes,
and court rules, a verbatim record should be made of the plea
proceeding, the court should inform defendant of the nature
of the charge, advise defendant of the consequence of his
plea, determine if a confession made to police is the cause
of the plea and if so advise defendant of his right to a
Walker-type hearing to determine the voluntariness of the
confession and before defendant can be found guilty the
court must conclude that defendant's plea was freely, under-
standingly and voluntarily made.

DISSENTING OPINION.

ADAMS, J.

30. CRIMINAL LAW—PLEA OF GUILTY—PROCEDURAL RIGHTS—WALKER
HEARING—VOLUNTARY PLEA.

Lack of information as to what happened to defendant who later
pleaded guilty to breaking and entering, from Saturday
evening when he was arrested until Monday morning when
he was arraigned, is sufficient cause to remand the case for
a Walker-type hearing where defendant alleges that his plea
was involuntary because he was held incommunicado from the
time of arrest until arraignment, denied an attorney and
threatened with violence.

31. CRIMINAL LAW—PLEA OF GUILTY—VOLUNTARINESS—PROCEDURAL
RIGHTS—COURT RULES.

The trial court did not comply with the court rules where
it allowed defendant to plead guilty of breaking and entering
without being told that he had a right to a trial without a
jury by the court and that he was subjecting himself to a
penalty provided by law including possible confinement in
a penal institution (GCR 1963, 785.3[2]).

32. CRIMINAL LAW—PLEA OF GUILTY—PROCEDURE—DISCRETION.
  *The procedure for taking guilty pleas is largely left to the discretion of the trial judge.*

33. CRIMINAL LAW—PLEA OF GUILTY—APPEAL AND ERROR—VOLUNTARINESS—WRITTEN QUESTIONNAIRE.
  *Broad rules for review of guilty pleas by appellate courts would be unnecessary if after interrogation of criminal defendants by the trial judge and before acceptance of the guilty plea, defendant were required, with the advice of counsel, to fill out a written questionnaire framed by the judges of the circuit which would make it clear defendant voluntarily and understandingly pleaded guilty.*

Appeal from Court of Appeals, Division 2, Lesinki, C. J., and Quinn and Gilmore, JJ., reversing and remanding Jackson, John C. Dalton, J. Submitted February 5, 1969. (Calendar No. 10, Docket No. 51,955.)  Decided April 13, 1970.

9 Mich App 333, reversed.

John Robert Taylor was convicted of breaking and entering with intent to commit a larceny.  Defendant appealed to Court of Appeals.  Reversed and remanded.  The people appeal.  Court of Appeals reversed, and conviction affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Bruce A. Barton,* Prosecuting Attorney, and *Vincent F. Stapley,* Assistant Prosecuting Attorney, for the people.

*L. Russell Heuman,* for defendant on appeal.

*Elmer L. Radka,* President, Prosecuting Attorneys' Association of Michigan, and *Samuel J. Torina,* Chief of Appellate Procedure Committee, *amicus curiae.*

T. E. Brennan, C. J.

### The Facts

On April 19, 1965, the prosecuting attorney for Jackson county issued an authorization for a warrant to one David C. McGarvey, justice of the peace. It requested that a warrant issue for the arrest of John Robert Taylor for the offense of breaking and entering an auto wash on or about March 8, 1965.

On the same day, April 19, 1965, a criminal complaint was taken, subscribed and sworn to before McGarvey by one Lt. James Myers, in which Myers accused Taylor of commiting the burglary.

Also on the same day, a warrant for the arrest of Taylor was issued by the justice of the peace. Upon that warrant, there appears the return of the officer, certifying that John Robert Taylor was taken by virtue of the warrant. The return of the officer is dated April 14, 1965.

Further, on April 19, 1965, Justice of the Peace McGarvey made his return to circuit court on examination, in which he represents to the circuit court that a written complaint was taken in the matter; that the complainant was orally examined by him; that a warrant was duly issued; that the accused was duly arrested by virtue of the warrant; that the accused was brought before him, waived examination, and bound to appear in circuit court on April 20, 1965; that the accused's rights in the premises were duly explained to him by the justice of the peace.

Thereupon, an information was filed in the circuit court for Jackson county, by the prosecuting attorney thereof in the March term, charging John Robert Taylor with the crime of breaking and entering contrary to CL 1948, § 750.110, as amended by PA 1964, No 133 (Stat Ann 1965 Cum Supp § 28.305).

On April 20, 1965, defendant Taylor was arraigned in circuit court, upon such information. The transcript shows the following colloquy among the defendant, the court, and the prosecutor:

"Jackson, Michigan,
Tuesday, April 20, 1965,
9:36 o'clock A.M.

*"The Court:* All right.

*"Mr. Fleming:* John Robert Taylor?

*"The Defendant:* Yes, sir.

*"Mr. Fleming:* You want to step up here to this table. (*sic*) please?

*"The Defendant:* Yes, sir.

(*The defendant, John Robert Taylor, then stepped before the court.*)

*"Mr. Fleming (addressing the court):* This is file X3–185, your Honor.

*"The Court:* All right.

*"Mr. Fleming (addressing the defendant):* For the record: your name is John Robert Taylor?

*"The Defendant:* Yes, sir.

*"Mr. Fleming:* Where were you born, John?

*"The Defendant:* Jackson, Michigan.

*"Mr. Fleming:* Jackson, Michigan?

*"The Defendant:* Yes.

*"Mr. Fleming:* And what is the date of your birth?

*"The Defendant:* 1/6/36.

*"Mr. Fleming:* January 6th of 1936?

*"The Defendant:* Yes, right.

*"Mr. Fleming:* And that makes you how old a man now?

*"The Defendant:* 29.

*"Mr. Fleming:* 29?

*"The Defendant:* Yes.

*"Mr. Fleming:* And what has been your address?

*"The Defendant:* 303 Broad Street, Michigan Center.

*"Mr. Fleming:* What was that again?

*"The Defendant:* 303 Broad Street, Michigan Center.

*"Mr. Fleming:* 303 Broad Street, Michigan Center, Michigan?

*"The Defendant:* Yes, sir.

*"Mr. Fleming:* Who do you live there with?

*"The Defendant:* My sister and her husband.

*"Mr. Fleming:* Do you have an attorney here this morning, John?

*"The Defendant:* No, I don't.

*"The Court:* You understand that you are entitled to an attorney of your own choice and if you are unable to furnish one that the state will furnish you one?

*"The Defendant:* Yes, sir.

*"The Court:* You understand that?

*"The Defendant:* Yes, sir.

*"The Court:* And also that you are entitled to a jury trial if you so desire?

*"The Defendant:* Yes, sir.

*"The Court:* You understand that?

*"The Defendant:* Yes, sir.

*"The Court:* You understand that you are charged with breaking and entering Leo's Auto Wash?

*"The Defendant:* Yes, sir.

*"The Court:* You understand that?

*"The Defendant:* Yes, sir.

*"The Court:* How do you wish to plead?

*"The Defendant:* I wish to stand mute.

*"The Court (*addressing the clerk*):* All right, Mr. Clerk, let the record show that the defendant waives reading of the information, stands mute, and a plea of not guilty is entered by order of the court, and he is remanded to the custody of the sheriff to await trial. Bond, $1,000.

"That's all.

"I hereby certify that the foregoing transcript is true and correct to the best of my knowledge, information and belief.

"(*signed*) John Simpson,<br>
Circuit Judge."

Three days later, on April 23, 1965, the defendant again appeared in circuit court. Once more, the prosecuting attorney was present. In addition, Stephen Pearse, chief probation officer of Jackson county, was also present in court. The proceedings were as follows:

"*Mr. Fleming:* John Robert Taylor.

(*The defendant walked up to the counsel table in front of the bench.*)

"*Mr. Fleming:* This, your Honor, is file X3–185.

"Mr. Taylor, what occurred, you requested through my office to be brought up here today to change your plea from that previously entered of not guilty to that of guilty to this charge.

"*The Defendant:* Yes, sir.

"*The Court:* You understand that this charges that on or about March 8, 1965, you did break and enter the building known as Leo's Auto Wash.

"You understand that?

"*The Defendant:* Yes, sir.

"*The Court:* You know that is a felony?

"*The Defendant:* Yes, sir.

"*The Court:* You have heard me tell the others. I was not present at your arraignment, but I assume you were told you had a right to a trial by jury and, also, if you had no money with which to hire an attorney, that upon request from you that the court might appoint an attorney for you.

"Were you told that?

"*The Defendant:* Yes, sir.

"*The Court:* Do you wish an attorney appointed?

"*The Defendant:* No, sir.

"*The Court:* And did you on or about March 8, 1965, break into Leo's Auto Wash?

"*The Defendant:* Yes, sir.

"*The Court:* Why did you break in?

"*The Defendant:* To obtain whatever money might be found inside.

"*The Court:* In other words, if there was money in the building, you intended to steal it, is that correct?

"*The Defendant:* Yes, sir.

"*The Court:* Pardon?

"*The Defendant:* Yes, sir.

"*The Court:* Have any promises been made to you to get you to plead guilty?

"*The Defendant:* No, sir.

"*The Court:* Have any threats been made against you?

"*The Defendant:* No.

"*The Court:* Are you entering this plea freely and voluntarily?

"*The Defendant:* Yes, sir.

"*The Court:* Are you on probation or parole at present?

"*The Defendant:* No, sir, I am not.

"*The Court:* Very well. The court will accept your plea of guilty.

"You are not able to make bond?

"*The Defendant:* Well, my folks are working on it right now. They are in the process of it.

"*The Court:* The reason I asked you is that you probably would be sentenced sooner if I did not fix a definite date for sentence. But if you think there is a possibility of your folks making bond for you, I will fix your date of sentence for May 14, 1965, at 9 a.m.

"*The Defendant:* Thank you.

"*The Court:* And your bond is—

"*The Defendant (interrupting):* I believe it was the same as the other one, your Honor, two thousand.

"*The Court:* Two thousand dollars?

"All right. We will fix your bond at two thousand dollars, and in default thereof you are remanded to the custody of the sheriff.

"This matter will be referred to the probation * * *  ."

On May 14, 1965, defendant was sentenced to a prison term of 29 months minimum to 10 years maximum.

On November 17, 1965, defendant Taylor filed in circuit court his affidavit of indigency, and a motion for appointment of appellate counsel. Hearing on the indigency petition was waived by the prosecutor, and on January 11, 1966, L. Russell Heuman was appointed appellate counsel.

On the same day, January 11, 1966, defendant Taylor, acting *in propria persona,* filed in circuit court an application for leave to file a delayed petition to set aside conviction and sentence and grant a new trial; an affidavit of indigency and facts of the case; a petition to withdraw plea of guilty, set aside conviction and grant new trial; a brief in support thereof; and a petition to be admitted to bail.

On February 1, 1966, the prosecuting attorney filed an answer to the motion for new trial. On March 18, 1966, the motion was argued orally, and taken under advisement. On May 24, 1966, the circuit judge filed his opinion and order denying the motion for new trial.

While no order appears in the record, we must assume that the circuit judge granted the application for leave to file delayed petition for new trial. The delayed petition was in fact filed, answered on its merits and ruled upon by the trial court.

In his January 11, 1966, petition and in the affidavit filed therewith, defendant Taylor makes the following allegations:

1. That he was arrested without a warrant in his mother's public restaurant, forced to march to the curb and stretch his hands and arms across the top of a car while being searched and subsequently taken to jail.

2. That he was not told by the arresting officers that he was charged with any crime.

3. That he was not allowed to give his mother a message prior to his arrest.

4. That he was taken to the Jackson County Jail.

5. That he was interrogated "relentlessly" by city police officers and members of the sheriff's department.

6. That when one group of officers would leave, another group would continue the "incessant" interrogation.

7. That he was not told by the officers that he had a constitutional right to remain silent.

8. That he was not told by the officers that he had a right to counsel during the interrogation.

9. That he was encouraged and "enticed" by the officers to make incriminating statements.

10. That his statements were used as a "stick" to elicit a false plea of guilty to a crime which defendant did not commit.

11. That he was told he could call his mother if he admitted participating in "some alleged crime."

12. That he was told that his name had been mentioned in connection with such crime by other prisoners who were upstairs, and whose testimony would be used to convict him.

13. That he "can produce witnesses to prove * * * that he did not break and enter any place of business."

14. That his accusation in this cause was the result of police fraud and deceit, practiced upon certain of defendants' acquaintances, in that the police had lead such acquaintances to believe that he (Taylor) had "called the police on them," as a result of which, his acquaintances had falsely accused him.

15. That throughout the entire litigation, he had not had the advice of counsel.

16. That he was "ordered" to make a plea during the arraignment.

17. That he was told by the police that if he admitted participation in the crime he would be released on bond.

18. That the police threatened to put him upstairs with the other boys, and "they'll stomp you to death."

On October 7, 1966, defendant, acting through his appointed counsel, filed an application for delayed appeal in the Court of Appeals.

In support of the application, defendant's counsel filed a brief, which begins with a "Statement of Facts." That "Statement of Facts" contains the following allegations which do not appear in the trial court record, nor in the defendant's motion for new trial and affidavit in support thereof:

1. That defendant was arrested on April 17, 1965, at approximately 8:30 p.m.

2. That around 10:30 or 11 p.m. of April 17, 1965, the police put another prisoner, one Lynn Negus, in a room with Taylor.

3. That the reason or motivation of the police in putting Negus together with Taylor was to force Taylor to admit the crime to obtain the release of Negus and several others.

4. That Negus was urged by the police to "beat up" Taylor.

5. That Taylor requested to use the phone several times, which was not allowed.

6. That Taylor was questioned by three police officers early in the morning of April 18, 1965, and that he refused to incriminate himself.

Incorporated in the defendant's brief in support of application for leave to take a delayed appeal is the affidavit of one Jack E. Havens, an inmate of Jackson Prison. That affidavit is quite detailed, and is printed in full in the appendix.

On November 7, 1966, the prosecuting attorney filed in the Court of Appeals his brief in opposition to the application.

In the counter-statement of facts, contained in that brief, the prosecutor sets forth that Taylor was arrested on Saturday evening, April 17, 1965, as claimed by defendant.

On December 2, 1966, the Court of Appeals granted leave to appeal.

On March 8, 1967, the Court of Appeals remanded the cause to circuit court for the purpose of admitting the defendant to bail, and on March 17, 1967, defendant posted a surety bond in the amount of $1,500. The recognizance was filed one year, ten months and three days after Taylor was sentenced.

In due course the appeal was heard in the Court of Appeals. Circuit Judge HORACE W. GILMORE, sitting by assignment of the Court Administrator, wrote the opinion for himself, Chief Judge LESINSKI and Judge QUINN.[1]

In that opinion, the appeals court held that the record did not satisfactorily disclose that the defendant's plea of guilty was "freely, understandingly and voluntarily made, without undue influence, compulsion, or duress, and without promise of leniency."[2]

That Court particularly emphasized that the failure of the trial judge to advise the defendant what punishment might follow his conviction, evidenced an inadequate determination of voluntariness, and an abuse of discretion by the trial judge in failing to set aside the conviction and grant a new trial.

The Court of Appeals opinion thereupon outlined, by way of instruction to the bench and bar, five minimum requirements for acceptance of pleas of guilty in felony cases,[3] together with 21 suggested points of interrogation as a guide to the trial bench.[4]

---

[1] 9 Mich App 333 (1968).
[2] *Id.*, p 336.
[3] *Id.*, pp 337, 338.
[4] *Id.*, pp 339–341.

Because the Court of Appeals opinion purported to establish standards broader than existing court rules, this Court granted leave to appeal *sua sponte,* on February 9, 1968.

## DISCUSSION

That our courts have been sorely vexed by a rash of appeals and post-conviction motions in cases involving pleas of guilty, needs no elaboration here.

That differences of view with respect to such cases exists at every level in the judicial system is equally apparent. Our own Court's amendments of Rule 785,[5] and subsequent repeal of amendments[6] is notable, as is the fact that the instant case was heard and submitted in this Court more than a year ago.

Despite several years of debate, countless regional and state-wide conferences, and dozens of individual cases, confusion remains, and the demand for definitive guidelines has not subsided.

Recently, the United States Supreme Court, long loath to enter the arena, has begun to address itself to the problem.

*Boykin v. Alabama* (1969), 395 US 238 (89 S Ct 1709, 23 L Ed 2d 274), does not alter any of our Michigan holdings. There, defendant was charged with common-law robbery, an offense punishable in Alabama by death.

Defendant plead guilty. The only record of the plea-taking is contained on page 245 in a footnote to the dissenting opinion of Mr. Justice Harlan:

" 'This day in open court came the State of Alabama by its district attorney and the defendant in his own proper person and with his attorney, Evan Austill, and the defendant in open court on this day

---

[5] GCR 1963, 785.—REPORTER.
[6] See 373 Mich xv *et seq.;* 376 Mich xlii *et seq.;* 378 Mich xxxviii *et seq.;* 379 Mich xxvi *et seq.;* and 379 Mich xxx *et seq.*—REPORTER.

being arraigned on the indictment in these cases charging him with the offense of robbery and plead guilty.' "

The United States Supreme Court majority, speaking through Mr. Justice Douglas, held, p 242:

"It was error, plain on the face of the record, for the trial judge to accept petitioner's guilty plea without an affirmative showing that it was intelligent and voluntary."

After citing *Jackson v. Denno* (1964), 378 US 368 (84 S Ct 1774, 12 L Ed 2d 908, 1 ALR3d 1205) (1964), and *Carnley v. Cochran* (1962), 369 US 506 (82 S Ct 884, 8 L Ed 2d 70), to the proposition that,

" 'Presuming waiver from a silent record is impermissible,' "

the Court goes on to say,

"We think that the same standard must be applied to determining whether a guilty plea is voluntarily made,"

and further,

"Several federal constitutional rights are involved in a waiver that takes place when a plea of guilty is entered in a state criminal trial."

The Court further enumerates the privilege against compulsory self-incrimination, the right to trial by jury, and the right to confront one's accusers.

The Court did not say, as some have suggested, that explicit and expressed waivers must be taken upon each of these constitutional rights before the plea can be accepted.

The holding is more properly, that these rights are waived by the act of entering the guilty plea,

and it is for this reason that a record must be made upon the question of voluntariness.

This understanding of the case is highlighted by the dissent. The Harlan opinion criticizes the majority on the ground that its holding "* * * fastens upon the States, as a matter of federal constitutional law, the rigid prophylactic requirements of Rule 11 of the Federal Rules of Criminal Procedure."

The dissent, in effect, accuses the majority of applying *McCarthy* v. *United States* (1969), 394 US 459 (89 S Ct 1166, 22 L Ed 2d 418) to the states rettroactively, while applying it to the Federal courts propectively only, via *Halliday* v. *United States* (1969), 394 US 831 (89 S Ct 1498, 23 L Ed 2d 16).

The *McCarthy* decision held that a failure to comply with Federal Rule 11, by a failure to "address the defendant personally" was reversible error.

Mr. Chief Justice Warren, writing in *McCarthy,* directed attention to the 1966 amendment of Rule 11, which now provides:

"A defendant may plead not guilty, guilty or, with the consent of the court, *nolo contendere.* The court may refuse to accept a plea of guilty, and shall not accept *such* plea *or a plea of nolo contendere* without first *addressing the defendant personally and* determining that the plea is made voluntarily with understanding of the nature of the charge *and the consequence of the plea.* If a defendant refuses to plead or if the court refuses to accept a plea of guilty or if a defendant corporation fails to appear, the court shall enter a plea of not guilty. *The court shall not enter a judgment upon a plea of guilty unless it is satisfied that there is a factual basis for the plea.*[7] (As amended Feb. 28, 1966, eff July 1, 1966.)

---

[7] 394 US 459, 462, note 4.

By footnote, the Chief Justice referred to the notes of the Advisory Committee on Criminal Rules, which were published in connection with the 1966 amendment. These notes are of particular interest to those of us who labor in the Michigan judicial vineyards. They say:

"For a similar requirement see Stat Ann § 28-.1058; Court Rule No 35A (1945); *In re Valle* (1961), 364 Mich 471 (110 NW2d 673); *People* v. *Barrows* (1959), 358 Mich 267 (99 NW2d 347); *People* v. *Bumpus* (1959), 355 Mich 374 (94 NW2d 854); *People* v. *Coates* (1953), 337 Mich 56 (59 NW2d 83)."[8]

No other state statutes, state court rules, or state court decisions are cited in the Committee notes attending the 1966 amendment of Federal Rule 11.

In all modesty, we conclude that the 1966 amendment of Federal Rule 11 was designed to bring Federal court practice up to the standard of our Michigan practice; that the *McCarthy* case was in furtherance of that object and that the *Boykin* case, even when read through the piercing eyes of the dissent, merely stands for the proposition that our sister state of Alabama is being federally mandated to comply with long-standing Michigan practice.

Under none of our Michigan holdings would *Boykin's* no-transcript, no-colloquy, no-advice plea have been held valid.

Our difficulties in Michigan linger in spite of forward-looking statutes, court rules, and case holdings. We have begun to discover in advance of the Federal courts that the fond hopes of Chief Justice Warren in *McCarthy*[9] are more easily expressed than realized.

---

[8] 8 Moore's Federal Practice, Criminal Rules § 11.01[3] p 11–3.

[9] "Second, the Rule is intended to produce a complete record at the time the plea is entered of the factors relevant to this volun-

No amount of "buttoning down" at the plea hearing has brought about the salutary reduction in collateral attacks upon plea-based convictions.

In this maze, we must choose our own course, if not by the prescience of court rule, then at least by clear hindsight demonstrably incorporated in an understandable body of case law.

This appeal of Taylor presents an opportunity to get on with it. And if Taylor adds anything to the melee, it is this—there is as much, if not more, need for guidelines at the appellate as at the trial level.

Perhaps we have placed too much emphasis on trying to define the trial judge's role in the acceptance of a plea, and too little emphasis on defining the role of the appellate courts in the reviewing of convictions based upon pleas of guilty.

A direct appeal from a conviction based upon a plea of guilty, whether such appeal be timely or delayed, presents only a limited number of possible grounds for reversal.

Essentially, such grounds are:

---

tariness determination. Thus, the more meticulously the Rule is adhered to, the more it tends to discourage, or at least to enable more expeditious disposition of, the numerous and often frivolous post-conviction attacks on the constitutional validity of guilty pleas." *McCarthy, supra,* p 465.

\* \* \*

"We thus conclude that prejudice inheres in a failure to comply with Rule 11, for noncompliance deprives the defendant of the Rule's procedural safeguards that are designed to facilitate a more accurate determination of the voluntariness of his plea. Our holding that a defendant whose plea has been accepted in violation of Rule 11 should be afforded the opportunity to plead anew not only will insure that every accused is afforded those procedural safeguards, but also will help reduce the great waste of judicial resources required to process the frivolous attacks on guilty plea convictions that are encouraged, and are more difficult to dispose of, when the original record is inadequate. It is, therefore, not too much to require that, before sentencing defendants to years of imprisonment, district judges take the few minutes necessary to inform them of their rights and to determine whether they understand the action they are taking." *McCarthy, supra,* pp 471, 472.

1. That the sentence below was not rendered in accordance with the law.

2. That upon the record before the trial judge at the time of sentencing, the trial court erred as a matter of law in pronouncing judgment of sentence upon the defendant.

3. That upon the record before the trial judge at the time the plea of guilty was accepted, the trial court abused its discretion in accepting the plea of guilty.

Among the issues which might be raised in the first class of cases are such things as: sentence exceeded the maximum provided by law; failure to give credit for time served pending trial; failure to impose concurrent sentence; and Eighth Amendment questions of cruel and unusual punishment.

In the second category are such matters as: failure to secure a pre-sentence report; arbitrary refusal to permit timely withdrawal of plea before sentencing; refusal to permit statement on behalf of defendant before sentencing; and absence of an accepted plea of guilty on the record.

In the third class, fall those cases wherein the court should not have accepted the plea in the first place, such as: ambiguous or equivocal admission of guilt; failure to advise as to the right of counsel; failure to provide counsel for indigent where requested; failure to inform the defendant of the nature of the charge; failure to advise defendant of the consequence of the plea; failure to examine as to the voluntariness of the plea.

A direct appeal from a plea-based conviction is not a proper vehicle by which to challenge the voluntariness of the plea. Whether or not a plea of guilty was offered voluntarily is a question of fact. That question of fact cannot be determined under our adversary system of jurisprudence in a pro-

ceeding in which that question of fact was never put in issue.

The trial judge's duty as defined by statute and court rule is to inquire into and examine the voluntariness of the plea. This is a quasi-administrative function. It is designed to protect unknowing defendants from their own mistakes, and to discharge society's *ex parte* obligation to avoid those avoidable miscarriages of justice.

No one ever contended that the colloquy between the court and the defendant at the time of plea taking was a trial upon the issue of voluntariness, or that the court's quasi-administrative determination that it is reasonable to accept the plea makes the question of voluntariness *res judicata*.

Similarly, a direct appeal from a plea-based conviction is not a proper vehicle by which to challenge the truth of the plea. Whether or not the defendant is actually guilty is a question of fact. By hypothesis, that question of fact cannot be litigated in a proceeding in which both sides agree that the defendant is guilty. As in the case of voluntariness, the trial judge has a duty to satisfy himself as to the truth of the plea. But no one would contend that the judge's dialogue with the defendants constitutes a trial on the merits.

The remedy of direct appeal, with its necessarily limited and record-circumscribed inquiry, is not the only route of attack upon a plea-based conviction. Frequently, the appeal is not directly from the conviction itself, but rather is from the trial court's denial of a motion for new trial. In such cases, trial courts, and appellate courts on review, must examine the allegations of the motion, the affidavits in support thereof, and the testimony, if any, adduced or offered upon the hearing on the motion.

Generally, motions for new trial after plea-based convictions will follow one of two courses. Either they will allege that the plea was not voluntary, or that it was not true.

To be successful upon the former ground, the motion and its supporting affidavits and proofs must satisfy the trial court by a preponderance of credible evidence that the plea was the product of fraud, duress, or coercion, or so devoid of understanding that the defendant could not be said to have been *sui juris*.

Where the motion for new trial alleges that the plea was not voluntary, evidence that the plea was not true may also be taken. That is to say, in a motion for new trial based upon involuntariness of the plea, it is competent for the defendant to offer proof of his innocence, for such proof, even though not conclusive on the question of innocence, may tend to bolster the claim of involuntariness.

To succeed on the ground that the plea was not true, a defendant's motion and its supporting affidavits and offers of proof must raise in the mind of the trial court an honest and reasonable doubt as to the guilt of the defendant.

Where the motion is grounded upon the defendant's innocence, the plea of guilty need not be shown to have been involuntary. Nevertheless, a voluntary plea of guilty stands as evidence of guilt, and the moving defendant will have some burden, at least, to show that the plea was hasty, ill advised or entered as a result of misinformation or confusion.

A plea-based conviction is not *per se* more sacrosanct than a conviction upon a jury's verdict. In either case, a proper motion for new trial based upon after-discovered evidence must appeal to the discretion of the trial court. But the recorded colloquy of the plea taking will be no more lightly disregarded

on motion for new trial than would similarly damaging admissions made from the witness stand in a contested trial.

So saying, we recognize that a plea-convicted defendant might well, and often does, attack both the voluntariness and the truth of his plea, alleging in effect that he was and is innocent and that his plea was given as the product of coercion or fraud.

This is the posture of the instant case involving John Robert Taylor.

The appeal here involves the trial court's denial of defendant's motion for new trial. That motion was made on January 11, 1966, heard on March 18, 1966, and decided on May 24, 1966.

The affidavit of Jack Havens, attached to defendant's brief in the Court of Appeals, was made on April 10, 1966, and subscribed on May 13, 1966. It was not in existence on the date of the hearing on the motion for new trial, and if it was ever brought to the attention of the trial judge before his ruling on May 24, 1966, the record does not show it. Obviously, the record on appeal may not be enlarged *ex parte* by affidavits filed for the first time in the appellate court brief, and the affidavit by Havens should have been stricken from the brief.

In passing, however, it should be noted that the Havens affidavit is spurious help to the defendant at best, and in at least one particular it is absolutely damaging.

Havens does not unequivocally admit his own guilt, except to say, "We all three Carl, Lynn, & [*sic*] myself told him (Detective Southworth) everything we had done." And while he tells in great detail how he and the others came to accuse Taylor, nowhere does he state, or even imply, that their accusation of Taylor was untrue.

More importantly, the affidavit of Havens describes the events of the morning of April 23, 1965, and particularly the conversations had in the office of Lieutenant Myers between himself, Taylor and Myers. Havens' claim was that Taylor was still protesting his innocence, and that Myers was still trying to get Taylor to plead guilty. Moreover, this occurred four days after Taylor was taken before the magistrate and three days after his arraignment before the circuit judge.

The Havens affidavit, if accepted, would tend to refute defendant's claim that his plea of guilty was founded upon a confession illegally extracted from him during a period of unlawful detention over the preceding weekend.

Viewed properly, the case is even more simple. It was not until the introduction of defendant's brief in the Court of Appeals, the existence of the Havens affidavit and the prosecutor's reply brief, that any mention was made of defendant's arrest having been on April 17, 1965.

An appellate court, passing upon the propriety of a trial court's denial of motion for new trial, must view the motion through the eyes of the trial court. Judge Dalton had nothing before him on May 24, 1965, to intimate that the arrest took place on April 17, 1965. True, there was an unverified allegation in the motion for new trial that the defendant had been arrested without a warrant, but that allegation was not repeated under oath in the affidavit filed with the motion.

Quite to the contrary, and part of the record in the case, was the return of the justice of the peace that the defendant was arrested by virtue of the warrant issued April 19, 1965.

Defendant's attack on the truth of his plea consisted in the conclusionary claim that he "can pro-

duce witnesses to prove beyond any questionable doubt that he did not break and enter any place of business or any other kind of establishment."

Had defendant's conviction been based upon jury verdict instead of guilty plea, it is doubtful that such a bland boast would be given much credence, in the absence of testimonially-phrased affidavits from the mystery witnesses themselves.

The Court of Appeals is reversed, and the opinion and order of the trial court denying defendant's motion for new trial is affirmed. The cause is remanded to circuit court for cancellation of the defendant's bond for appearance.

KELLY, J., concurred with T. E. BRENNAN, C. J.

APPENDIX

"April 10, 1966

"Statement of Jack Havens

"My name is Jack Havens and I am a [*sic*] inmate at the State Prison at Jackson, Michigan serial 101161. I am making this statement of my own free will, freely and voluntarily. No threats or promises of any kind have been made to me, to get me to make it, and I have not been asked by anyone to say anything that is not true, or that did not happen. On or about April 15, 1965 I was arrested along with Carl Negus & Lynn Negus. We were taken to the Jackson County Jail, we were then charged with Breaking & Entering, questioned for quite some time and finally locked together in the same cell. While we were being questioned by Det. Southworth and other officers who's [*sic*] names I do not remember, Det. Southworth told us Carl, Lynn, and myself that someone we all thought was our friend, was the one who made the phone call to the police and put the

finger on all of us. Det. Southworth told us he knew that we did not do everything by ourself's [*sic*] and that if we all would cooperate and tell him all that we knew, he would tell us who made the phone call, and help Lynn & Carl Negus to get probation. He told me that the best he could do for me was to get me off with only a year, since I was on probation at the time of my arrest.

"*We all three Carl, Lynn, & myself told him everything we had done,* and then Det. Southworth told us that the guy that we all ran around with that owned the pink & white 1958 Chevy was the one who made the phone call and put the finger on us. Lynn, said right away that's Taylor. Afterwards when we were all locked up in a cell together, we talked it over between us, and decided that if John Taylor, whom we all knew and thought was our friend, who we all ran around with in Taylor's car, that if Taylor was the one who put the finger on us, we would all take him with us or make it as rough for Taylor as we could. The next time we were all questioned Carl, Lynn, & myself we told Det. Southworth, & Det. Myers, that Taylor was with us on everything that had happened, and we would all swear to it.

"Taylor was arrested Saturday night April 17, 1965 along with another of the guys we ran around with named Bill Pergel. They questioned Taylor for quite a while that first night because Bill Pergel was put in the same cell with us and later that night around midnight the police came and took Lynn Negus out and down to the office where Taylor was at. They made Lynn take his shoes off before going down to the office. When he came back we all asked what happened and Lynn said they had Taylor down in the office, and he was crying for a lawyer and a lie detector test and that he Taylor wouldn't admit to anything. Lynn said he told Taylor in front of the

police that he Taylor was in on everything that happened, but that Taylor denied everything. Lynn and Det. Meyers tried to get the other 2 officer's [*sic*] to leave the office with him and leave Taylor alone with Lynn so Lynn could make Taylor talk, but the other officer's would not go along with Det. Meyers plan.

"During the next 3 or 4 days we were all examined and arraigned, Bill Pergel, Lynn Negus, Carl Negus, John Taylor and myself. Det. Meyers told all of us except Taylor that he had made arrangements with James Fleming the prosecutor for us to stand mute before Judge Simpson at arraignment, and then later we would go before Judge Dalton and change our plea to guilty and that the bond would be reduced so that we could get out and get our affairs straightened out before we were sentenced. The reason he did not tell this to Taylor is that Taylor was locked in cell downstairs, while we were upstairs, and Meyers said Taylor still would not cooperate. Meyers said they were doing this for us because we had cooperated and that Judge Dalton was the judge that would give us the best break.

"On April 23, 1965 some time in the morning, Det. Myers called me into his office and told me that all the guys were set to go before Judge Dalton that afternoon and change their [*sic*] pleas to guilty, all except Taylor. He told me that as long as Taylor kept on being a hard head and would not go along and plead guilty with everyone else that none of us would be able to get out on bond, and he asked me to talk to Taylor and try to get him to go along with the program. I agreed to talk to Taylor so Meyers had Taylor brought to the office where Meyers and I were at. I told Taylor everything that Meyers had told me, and I told him that if he Taylor tried to fight in court that all of us Bill Pergel, Carl & Lynn Negus and myself would testify against him. I told

Taylor that he couldn't win and to go along with things, but Taylor said he was not pleading guilty to anything that he had not done. Then Det. Meyers called James Fleming on the phone and told him what Taylor had said. The prosecutor told Det. Meyers to tell Taylor that he Taylor would remain in the jail until that fall until he went to trial and that he Taylor would not get bail and that he would still be found guilty because all the guy's [*sic*] would testify against him Taylor. These things Meyers told to Taylor after he hung up the phone. Meyers then told Taylor that he Meyers was going down and take out warrant's on some more charges of Breaking & Entering and that he Taylor would have to stand trial on those to [*sic*] and with Taylor's old record that he Taylor would be supplemented and given a life sentence, so Meyers told Taylor if he wanted to do it the hard way it was up to him, but if he did not go along with everyone else and plead guilty that afternoon, he Meyers would do the things he said. I could see that Taylor was worried but all he said was I am not going to plead guilty to anything. All I can add to this is, that everyone Bill Pergel, Carl & Lynn Negus, Myself and John Taylor went before Judge Dalton that afternoon and did plead guilty. *What made Taylor change his mind I do not know, because when we were taken from the office that morning back to our cells Taylor still had not agreed to plead guilty.*

"I have read the above 1–1/4 pages and it is all true and correct to the best of my belief and did happen just as I have stated. This statement was typed in my presence and just as I dictated it in my own words with no changes made. The reason for this is because my handwriting is so poor it could not be read otherwise. (Emphasis supplied.)

"signed *Jack E. Havens*
101161

"Sworn and subscribed to before me this 13th day of May, A. D. 1966.

"/s/ *Paul J. LaDow*

"Notary Public, Jackson County, Michigan

"My commission expires April 5, 1969."

Black, J. (*concurring in reversal*). I agree with Chief Justice Brennan's analysis of *McCarthy* v. *United States* (1969), 394 US 459 (89 S Ct 1166, 22 L Ed 2d 418) and particularly with his view that it imposes no more than a new requirement, drawn from Federal Rule 11, which thus far applies only to criminal procedure in the courts of the Federal system. That view was strengthened when *Halliday* v. *United States* (1969), 394 US 831 (89 S Ct 1498, 23 L Ed 2d 16) was handed down last May.

I agree further that the sentencing judge did not err in accepting this defendant's plea of guilt. In this last regard, our recent decisions of *People* v. *Hobdy* (1968), 380 Mich 686, *People* v. *Dunn* (1968), 380 Mich 693, *People* v. *Stearns* (1968), 380 Mich 704, and *People* v. *Winegar* (1968), 380 Mich 719, all released May 8, 1968, settle the validity of the defendant's plea and Judge Dalton's acceptance thereof unless, as argued, intervening *Boykin* v. *Alabama* (1969), 395 US 238 (89 S Ct 1709, 23 L Ed 2d 274) handed down since this case was submitted, applies *nunc pro tunc* to defendant Taylor's prosecution and conviction in 1965. Judge Dalton did not, of course, interrogate the defendant as in *Boykin* newly specified. *Boykin* was unknown and not exactly prevised at that time.

There can be no doubt that *Boykin* has imposed upon state court trial judges additional duties as those judges go about the task of arraignment and sentencing, certainly in all cases of prosecution for

felony.[1] The question here is whether *Boykin* applies retroactively so as to invalidate Mr. Taylor's plea and the action taken by the sentencing judge on strength of that plea. If *Boykin* does apply, we should affirm the judgment of the Court of Appeals (9 Mich App 333). Otherwise reversal is in order. I hold that *Boykin* does not apply and therefore vote to reverse.

In 1965 the Supreme Court of California faced this same question of prospective or retrospective application of the rules of two then recent decisions, *Massiah* v. *United States* (1964), 377 US 201 (84 S Ct 1199, 12 L Ed 2d 246) and *Escobedo* v. *Illinois* (1964), 378 US 478 (84 S Ct 1758, 12 L Ed 2d 977). The occasion was the consideration and handing down of *People* v. *Dorado* (1965), 62 Cal 2d 338 (42 Cal Rptr 169, 398 P2d 361), shortly before *Linkletter* v. *Walker* (June 7, 1965), 381 US 618 (85 S Ct 1731, 14 L Ed 2d 601), was released. At that time the so-called Blackstonian theory held general sway, that is to say, the former and currently overruled decision was not regarded as bad law, but "never was the law."[2]

In *Dorado* the trouble was that no one anticipated, or could be expected to anticipate, that the Supreme Court would decide two years after *Escobedo* that the rule thereof "is to be applied prospectively." That was done however by *Johnson* v. *New Jersey* (June 20, 1966), 384 US 719 (86 S Ct 1772, 16 L Ed 2d 882). The California Supreme Court accordingly went ahead in *Dorado* with retroactive appli-

---

[1] See GCR 1963, 785, and our 1967 order repealing all amendments of that rule (379 Mich xxx, xxxi).

[2] See T. M. Kavanagh, J. in *In Re Palmer* (1963), 371 Mich 656, 664, quoting and following the traditional rule (taken from 7 RCL, Courts, § 36, p 1010, published 1915):

"The general principle is that a decision of a court of supreme jurisdiction overruling a former decision is retrospective in its operation, and the effect is not that the former decision is bad law, but that it never was the law."

cation of *Escobedo*, only to be let down when the Supreme Court belatedly ruled as in the *Johnson* case.

This vex of criminal justice in California was highlighted by Professor Phillip Johnson's resume appearing in volume 56 of California Law Review, starting at 1612. That resume is headed "The Supreme Court of California 1967–1969" and carries the foreword "Retroactivity in Retrospect." Starting on page 1620, under "The Miranda Warnings," Professor Johnson proceeded:

"The decision in *Tehan* v. *Shott* ([January 19, 1966], 382 US 406 [86 S Ct 459, 19 L Ed 2d 453]) seemed to indicate that the California supreme court was on the right track in interpreting the United States Supreme Court's attitude toward retroactivity. At the end of the same term of court, however, the Supreme Court gave the California courts, in particular, and the legal profession, in general, a rude shock by holding in *Johnson* v. *New Jersey* (*supra*) that the rules for confessions it had just announced in *Miranda* v. *Arizona* ([June 13, 1966], 384 US 436 [86 S Ct 1602, 16 L Ed 2d 694, 10 ALR 3d 974]) need not be applied to cases in which the trial began before the date of the decision."

Then, on page 1622, the resume proceeds, under "The Johnson Quandary":

"The California supreme court was left in an unenviable position when it considered the effect of the *Johnson* decision in *People* v. *Rollins*.[3] It had decided the *Dorado* case as it had, not because it had independently arrived at the conclusion that the Constitution compelled the result, but because it felt constrained by the necessary implications of the *Escobedo* opinion. In justifying the *Dorado* holding, the Court had stated that it was in the interests of

---

[3] For details of the cases reversed in the interval on strength of apparently retroactive *Escobedo,* see *People* v. *Rollins* (February 8, 1967) 65 Cal 2d 681 (56 Cal Rptr 293, 423 P2d 221, 226, 227).

California law enforcement officers to be informed
of the full sweep of the *Escobedo* decision sooner
rather than later, for in any event cases involving
confessions obtained without the required warnings
would be reversed by the United States Supreme
Court.

"Having thus faithfully discharged its duty to ap-
ply the Constitution as apparently interpreted by
the United States Supreme Court, the California
court found that it had unnecessarily reversed
dozens of convictions in which the trials had oc-
curred before the date of the *Miranda* decision. It
was now faced with the perplexing problem of what
to do with the cases tried before *Miranda* that were
still before it on direct review. If it stayed with the
final-judgment rule that it had adopted in the *Lopez*
case (*In re Lopez* [1965], 62 Cal 2d 368 [398 P2d
380, 42 Cal Rptr 188]) and applied the *Miranda* rules
to all cases pending on direct review, as the Supreme
Court had invited the state courts to do if they chose,
it would be forced to reverse many more cases in
which confessions had been obtained in full compli-
ance with its own *Dorado* decision. It could have
refused to apply either the *Miranda* or the *Dorado*
decisions to cases on direct review, but to do so
would make its prior reversals under the *Dorado*
decision seem like the height of folly, and current
affirmances the height of inequity."

Warned now as the California Supreme Court was
not warned for *Dorado,* I would adopt for these con-
tinuing questions of retroactive or prospective ap-
plicability a presumption that, where the Supreme
Court does not speak forth promptly (as it did in
*Roberts* v. *Russell* [June 10, 1968], 392 US 293 [88
S Ct 1921, 20 L Ed 2d 1100] for *Bruton* v. *United
States* [May 20, 1968], 391 US 123 [88 S Ct 1620, 20
L Ed 2d 476]), then that Court intends that each
*Boykin*-like decision shall apply prospectively, along
with application thereof to the case at hand. We did

so with good fortune when *People* v. *Woods* (1969), 382 Mich 128, presented another question of retroactivity arising under *Miranda*.

Viewing *Boykin,* the courts of some other states have already done as I would now do. See *State* v. *Urbano* (1969), 105 Ariz 13 (457 P2d 343) ; *State* v. *Griswold* (1969), 105 Ariz 1 (457 P2d 331); *Montanye* v. *State* (1969), 7 Md App 627 (256 A2d 706) ; *Silverberg* v. *Warden, Maryland Penitentiary* (1969), 7 Md App 657 (256 A2d 821) ; *Ernst* v. *State* (1969), 43 Wis 2d 661 (170 NW2d 713), and *In re Tahl* (1969), 1 Cal 3d 122 (460 P2d 449, 81 Cal Rptr 577).

Dethmers, J., concurred with Black, J.

T. G. Kavanagh, J. (*dissenting*). John Robert Taylor pleaded guilty to a charge of breaking and entering a business establishment[1] in Jackson County and was sentenced on May 14, 1965. An application for delayed appeal was granted by the Court of Appeals on December 2, 1966, and some time subsequent to an order of remand by that Court, the trial court released John Robert Taylor on bond. On February 1, 1968 the Court of Appeals ([1968], 9 Mich App 333) reversed the conviction and remanded the cause for further proceedings. On February 9, 1968, on its own motion this Court ordered a stay of proceedings in the cause and directed that it be certified to this Court as granted application for leave to appeal by the people. Justices Adams, T. M. Kavanagh and Souris dissented.

The only issue decided by the Court of Appeals was that by failing to inform the defendant of the maximum sentence possible the court failed to fol-

---

[1] CL 1948, § 750.110, as amended by PA 1964, No 133 (Stat Ann 1965 Cum Supp § 28.305).

low the requirements of GCR 1963, 785.3(2), because such advice is involved in the determination required by the rule that the plea was "freely, understandingly and voluntarily made without undue influence, compulsion or duress, and without promise of leniency."

We find no error in the Court of Appeals order and consequently we affirm, but because of the importance of this matter to the administration of justice in Michigan we set forth the considerations which hopefully explain our decision for the guidance of the bench and bar.

The importance of the guilty plea, the non-adversary method of determining guilt, and its role in the administration of justice cannot be too strongly emphasized. In Michigan it has become the method of disposing of 87.6%[2] of the criminal cases.

Because of this fact it behooves us to do whatever we can to make certain this procedure comports with our notions of fair play. The history of the criminal law is largely the recounting of judicial efforts to assure the accused a fair trial in the adversary process. We cannot now in good conscience do less to assure justice in this non-adversary proceeding.

The determination of guilt can come in either of two ways—by a trial—the adversary manner, or by the acceptance of a guilty plea—the non-adversary manner.

In either instance the trial judge[3] has a unique and important role. In the adversary manner of de-

---

[2] During the calendar year of 1968, 14,466 criminal cases were processed through the circuit courts of this State. Of this number, 12,671 (87.6%) were disposed of without trial, presumably the most by guilty pleas. (1968 Judicial Statistics for the State of Michigan, Office of the Court Administrator.)

[3] There is no intrinsic reason why a judge must accept a guilty plea (or for that matter impose a sentence).

Nothing special in the training and/or experience of a judge or lawyer equips him for such task. No reason for utilizing valuable judicial manpower in performing this basically non-adjudicating

termining guilt the trial judge has the ultimate responsibility for assuring a fair trial to the accused.

In a non-adversary method of determining "guilt" what can a trial judge do to guarantee to a person the due process and equal protection of the laws contemplated in our constitutions and jurisprudence?

Stated simply, all he can do—the most and the least—is do everything reasonably calculated to make certain that one who offers to have his guilt determined without a trial knows what he is doing and does it freely.

To this end the statutes and court rules have tried to set down standards and guidelines to provide some uniform practice in accomplishing it. The court rule requires that the court inform the accused of the *nature of the accusation* and the *consequence of his plea;* and as a condition of accepting the plea, examine the accused and ascertain that the plea was made freely, understandingly, and voluntarily.

"It is not too much to require that, before sentencing defendants to years of imprisonment, district judges take the few minutes necessary to inform them of their rights and determine whether they understand the action they are taking." *McCarthy* v. *United States* (1969), 394 US 459, 471, 472 (89 S Ct 1166, 22 L Ed 2d 418).

These conclusions of the trial judge are not rulings of law or findings of fact.

Nor is his acceptance of a guilty plea a ruling of law or finding of fact. It is merely a determination by the accepting court that he is satisfied the accused freely, understandingly and voluntarily, without undue influence, compulsion or duress and without promise of leniency waived his right to a trial and

---

task seems sound unless it be somehow an attempt to import to this non-adversary manner of determining guilt some of the devices, techniques and attitudes intended to assure due process and equal protection so carefully crafted in our adversary procedure.

the adversarial determination of guilt and voluntarily submitted himself to the court for punishment according to law.

Our court rule was intended to prescribe a standard practice for making this determination.

Appellate review of such determination can test only the question of whether the pleader knew what he was doing and did it voluntarily.

Appellate courts can go only by the record.

If the record does not show that the accused was informed that he was entitled to counsel, to process for the production of witnesses, to take or not to take the stand, to cross-examine the witness against him and to have the jury or judge convinced beyond a reasonable doubt, the conclusion that he voluntarily relinquished these rights which are incidental to a trial is not warranted.

In informing the accused of the nature of the accusation and the consequence of his plea it is not necessary to conduct a full-fledged law course or to anticipate all of the remote effects of the plea. It is enough if it can be said with reasonable certainty from an examination of the record that the accused knew what he was pleading guilty to and for all practical purposes what the result of such a plea would be.

Unless the record shows that the accused was advised of the maximum penalty to which his plea exposed him, it can not reasonably be concluded that he pleaded understandingly and freely.

Whatever other consideration may have prompted the accused to plead guilty, his possible sentence—his maximum exposure no less than his possible minimum—would seem to be a necessary element to an understanding and voluntary choice.

On behalf of the Court of Appeals, Judge GILMORE listed as minimum requirements for accepting a plea

of guilty in felony cases whether or not the defendant has counsel the following:

"First, a verbatim record of the entire proceedings shall be made.

"Second, the court must inform the defendant of the nature of the accusation. In doing so the court should avoid police jargon or catch titles and inform the defendant of the nature of the accusation in terms that a layman should comprehend under the circumstances. Additionally, the court shall determine whether the information has been read to the defendant and read or cause the same to be read to him unless he expressly waives the reading thereof.

"Third, the court must advise the defendant of the consequence of a plea of guilty. This means the court must inform him that he waives the right to trial by jury or the judge without jury and all the incidents thereof.

"Fourth, the court shall inquire as to whether the defendant has made any confession to the police prior to the time of his plea of guilty and ascertain if the confession is a reason for making the plea. If it appears that the confession is a basis for the plea, before accepting the plea the court shall advise the defendant that he is entitled to a Walker-type evidentiary hearing to ascertain if the confession was freely, voluntarily and constitutionally made. In applicable cases this hearing shall be had unless expressly waived.

"Fifth, the court must ascertain before accepting the plea that the plea has been freely, understandingly and voluntarily made, without any undue influence, compulsion, duress or promise of leniency. This means that the court must determine whether or not any promises of any kind have been made by anyone as to the court's disposition of the case, and if such were made, refuse the plea. It must advise the defendant that no promises can be made as to

the disposition.  Further, the court must satisfy itself on the record that the defendant understands that he has no obligation to plead guilty and that he subjects himself to anything up to the maximum punishment by doing so.  The court must advise defendant of the maximum sentence that can be imposed and the minimum sentence if there is a mandatory minimum.  The court shall ascertain if the defendant is on probation or parole, and inform him of the possible consequence of probation or parole violation.

"If at this point the court is satisfied that the defendant thoroughly understands the consequence of his plea, that he made the plea freely, understandingly and voluntarily and without any promise of leniency, or any undue influence, compulsion or duress, the court shall determine from a narration by the defendant or an interrogation of him that the defendant actually committed the crime to which he has pleaded guilty.  In other words, the defendant should be asked to state on the record what he did and the court must satisfy itself from the defendant's narrative or responses that the defendant actually is guilty of all the elements of the crime with which he is charged.  Then and only then can the court accept the plea of guilty."

The foregoing, and the questions[4] helpfully suggested by Judge GILMORE satisfy the letter and spirit of the statute and court rule.  But no formula or list of questions will guarantee against any eventuality the questioning of a guilty plea.

Only if the record discloses that the trial judge met the foregoing minimum requirements and reasonably concluded that the plea was freely, understandingly and voluntarily made under all circumstances can we say that the accused was accorded all

---

[4] *People* v. *Taylor* (1968), 9 Mich App 333, 337, 339–341.

of his rights as guaranteed by the Federal and State constitutions, statutes and court rules.

We cannot say so here.

Affirmed.

T. M. KAVANAGH and ADAMS, JJ., concurred with T. G. KAVANAGH, J.

ADAMS, J. (*dissenting*). The opening sentence of the people's concise statement of proceedings and facts upon application for leave to appeal to this Court states:

"On Saturday evening, April 17, 1965, the defendant was arrested by the Jackson County Sheriff's Department in connection with a breaking and entering of a car wash located in Jackson County."

The first sentence of the statement of facts contained in the brief for the people upon appeal to this Court states:

"On Saturday evening, April 17, 1965, the defendant was arrested by the Jackson County Sheriff's Department in connection with a breaking and entering of a business establishment located in Jackson County."

Judge John C. Dalton's opinion, dated May 24, 1966, in which he denied defendant's motion for a new trial, states:

"Basically, the grounds are that the plea of guilty heretofore entered by him on April 23, 1965, to a charge of breaking and entering was based upon an illegal and involuntary confession because he was arrested without a warrant or complaint, was interrogated by police officers relentlessly and incessantly until late that night and thereafter intermittently until coerced into admitting certain incriminating statements were true; and, further, because the alleged confession and/or admissions were obtained

during a period of illegal and incommunicado detention for a period exceeding two days before a warrant was obtained and an appearance had before a magistrate; and, further, because defendant was told by police officers time after time that if he admitted participation in the alleged crime or crimes he would be released on bond and he could call his mother in exchange for confessing to crimes which he knew nothing about, and that he was further threatened as set forth in paragraph 6 of his petition to withdraw plea of guilty. Defendant further claims that he is not in fact or in law guilty of the offense charged against him and his confession is a gross miscarriage of justice."

Judge Dalton's opinion then makes reference to the defendant's arraignment, the defendant's plea, the presentence investigation, the defendant's criminal record, and proceeds as follows:

"By his own statement to the investigation probation officer, besides the instant offense, petitioner participated in three other breaking and enterings, one attempted breaking and entering, and was an accessory in two others.

"For this petitioner to now *in fact* claim that he deliberately lied to this court upon his arraignment on April 23, 1965, does not command credibility.

"A *Walker* hearing would serve no useful purpose.

"His plea of guilty was freely, voluntarily, and understandingly made by him on April 23, 1965."

Nowhere in Judge Dalton's opinion on the motion for new trial, nowhere in the opinion of the Court of Appeals, and nowhere in Chief Justice THOMAS E. BRENNAN's opinion, is there contained anything in a statement of facts as to what occurred from the evening of April 17, 1965 to the following Monday, April 19, 1965, when a warrant for the arrest of John Robert Taylor was issued. The warrant, it may be

noted, was for a breaking and entering that occurred on March 8, 1965.

Defendant's counter-statement of facts contained in defendant's brief filed with this Court, with the assistance of counsel, contains the following with regard to the two-day period before the warrant was issued:

"On April 17, 1965, John Taylor was arrested, at his mother's restaurant, without a warrant having been issued. He was not allowed to leave a note advising his mother of the occurrence, and was taken to the Jackson County jail, and there they interrogated him relentlessly and incessantly by relays of city and county police officers relative to the breaking and entering of a car wash. He was not charged with this crime until April 19th.

"At 10:30 or 11 p.m. on April 17, 1965, another prisoner, Lynn Negus, was placed in the room with defendant, who attempted to induce defendant to admit participation in the crime by stating that his (Taylor's) refusal to do so was preventing Negus and others then being detained from being released on bond. Negus was also urged by police officers to beat Taylor.

"Taylor, still being held incommunicado, was again questioned on the morning of April 18, 1965, and told by three police officers, 'If you cooperate with us and the other boys, you can call your mother and we'll help you get out on bond.' Upon his refusal, he was told in a loud voice, 'We'll put you upstairs with them and they'll stomp you to death.' Also, defendant's father was used to coerce his confession.

"During the entire period, Taylor was without counsel and was refused use of the telephone to call his mother.

"On April 19, 1965, a period in excess of two days after his arrest, Taylor was arraigned before a magistrate."

The meager record we have before us as to what occurred from Saturday evening, April 17, 1965 until Monday, April 19, 1965, raises several questions:

Are the facts alleged by Taylor true?

If he was not held incommunicado, if he was not denied an attorney, and if he was not threatened with violence to secure his confession, what did occur?

Ordinarily, I would favor remand for a *Walker*-type hearing to be conducted by an outside judge. However, this appeal has been pending much too long. Some conclusive resolution of it should be achieved by this Court if at all possible.

In *People* v. *Dunn* (1968), 380 Mich 693, this Court held (p 700):

"We here hold that the meaning of the 'consequence' of a plea of guilty, within the wording of the rule, is that an accused, by so pleading, waives his right to trial by jury, or trial without a jury by the court, and that additionally the accused subjects himself to whatever penalty is prescribed by law, including possible confinement in a penal institution. Under the rule, the accused must be advised minimally of the foregoing."

Taylor was not told that he had a right to a "trial without a jury by the court", and he was not informed that he was subjecting himself to whatever penalty is provided by law, "including possible confinement in a penal institution". I agree with the Court of Appeals that the trial court did not comply with the requirements of GCR 1963, 785.3(2), 9 Mich App 333, 336.

Since I shall vote to remand to the trial court for a new trial, I do not deem it necessary to pass upon the defendant's claims that his constitutional rights were violated. These claims, it may be noted, have

not been passed upon by the Court of Appeals or by this Court even though defendant sought review of the same.

In this case the Court of Appeals addressed itself to the problem of plea taking when a defendant wishes to enter a plea of guilty. Chief Justice Brennan, in his opinion, has addressed himself to the role of appellate courts in reviewing guilty pleas. Until this Court elects to re-formulate detailed requirements for the taking of pleas, such as were set forth in repealed GCR 1963, 785.3(2), the procedure must largely be left up to the individual trial judge.

In an application for leave to appeal that was recently before this Court, the record reveals that while the trial judge was interrogating a defendant who wished to plead guilty and, as the judge was informing the defendant of his rights, the judge interjected: "I've got to go through this rigmarole, do your understand?" The brief by counsel for defendant in this case refers to "mechanical questions by the judge".

During the calendar year 1968, 14,466 criminal cases were processed through the circuit courts of this State. Of this number, 12,671 (87.6%) were disposed of without trial, presumably the most by guilty pleas. It is a well-known fact that in our busier circuits defendants are carted to our courts in busloads for the taking of guilty pleas. It is not at all uncommon for a busy judge on a busy day to take the pleas of a large number of defendants. It is easy to understand how a judge can come to regard the process as "rigmarole" and can, even without meaning to do so, conduct the examination mechanically.

I believe that much of the difficulty both trial courts and appellate courts are encountering with guilty pleas could be obviated if, once the trial judge

has completed his interrogation of a defendant, before he accepts the plea of guilty, the judge would present to the defendant a written questionnaire framed by the judges in the circuit along the lines of the 21 questions set forth in the opinion of the Court of Appeals in this case. The defendant should be instructed to complete the form by giving written answers to the interrogatories with the advice of counsel and to sign and return the same to the trial judge by some later designated time. Upon the return of the form to the trial judge and such examination by him and such further questioning as he deems necessary, if the judge decides a plea of guilty should be accepted, he should so state and the completed and signed questionnaire should be made a part of the record in the case.

If the above procedure were to be followed, there would be no need to attempt to formulate broad rules for review by our appellate courts.

I vote to affirm the Court of Appeals and to reverse the trial court and to remand to the trial court for a new trial.