PEOPLE v PATMORE

Docket No. 250019. Submitted October 5, 2004, at Grand Rapids.
    Decided October 19, 2004, at 9:00 a.m. Leave to appeal sought.
    James D. Patmore pleaded no contest in the St. Joseph Circuit Court
      to charges of assault with intent to commit murder and resisting
      and obstructing a police officer. The court, John F. Foley, J., upon the
      defendant's motion before sentencing, vacated the plea on the basis
      that the alleged victim essentially recanted her preliminary exami-
      nation testimony. The prosecution appealed by leave granted.

    The Court of Appeals *held*:

    1. MCR 6.310(B) provides in part that a court, in the interest
of justice, may permit an accepted plea to be withdrawn before
sentence is imposed unless withdrawal of the plea would substan-
tially prejudice the prosecutor because of reliance on the plea. To
support withdrawal of the plea in the interest of justice under
MCR 6.3101(B), a defendant has the burden of establishing a fair
and just reason for withdrawal of the plea. If the defendant meets
that burden, then the prosecution has the burden of showing that
substantial prejudice would result from allowing withdrawal of the
plea.

    2. In this case, the defendant argued that there was an
insufficient factual basis for the plea in light of the victim's
recantation testimony. However, the victim's recantation testi-
mony was less than unequivocal, whereas her preliminary exami-
nation testimony, on which the plea was accepted, MCR
6.302(D)(2), was unequivocal. The recantation came after the
defendant's incarceration during which the victim, pregnant
with his child, had met with the defendant. There was other
evidence supporting the belief that the victim's preliminary
examination evidence was truthful. Michigan courts regard re-
cantation testimony with suspicion. The defendant failed to
prove by a preponderance of credible evidence, i.e., by the motion,
its supporting affidavits, and proofs, that the victim's prelimi-
nary examination testimony was untruthful. The trial court
could not reasonably have granted the motion to withdraw
pursuant to MCR 6.310(B).

Remanded for reinstatement of plea and for sentencing.

CRIMINAL LAW — NO-CONTEST PLEA — MOTION FOR WITHDRAWAL — RECANTED
TESTIMONY.

> A criminal defendant who moves before sentencing to withdraw a
> no-contest plea whose factual basis was provided by preliminary
> examination testimony that has since been recanted must prove by
> a preponderance of credible evidence that the preliminary exami-
> nation testimony was untruthful; if the defendant meets this
> burden, the trial court must then determine whether other evi-
> dence is sufficient to support the factual basis of the plea; if the
> other evidence is sufficient to support the plea, then the motion
> must be denied; even if the defendant proves that the preliminary
> examination testimony was untruthful and the court determines
> that the other evidence is insufficient, the court must still deter-
> mine whether allowing withdrawal of the plea would substantially
> prejudice the prosecutor because of reliance on the plea (MCR
> 6.310[B]).

*Michael A. Cox*, Attorney General, *Thomas L. Casey*,
Solicitor General, and *Douglas K. Fisher*, Prosecuting
Attorney, for the people.

*Julianne Meyer-Sorek* for the defendant.

Before: NEFF, P.J., and SMOLENSKI and SCHUETTE, JJ.

SMOLENSKI, J. Defendant pleaded no contest to assault
with intent to commit murder, MCL 750.83, and resist-
ing or obstructing a police officer, MCL 750.81d(1).
Before sentencing, defendant moved to withdraw his
plea after the alleged victim of the assault essentially
recanted her preliminary examination testimony, testi-
mony which constituted a substantial portion of the
factual basis for defendant's plea. Following an eviden-
tiary hearing at which the victim testified, the trial
court granted defendant's motion and vacated the plea,
scheduling the case for trial. This Court granted the
prosecution's application for leave to appeal that order.
We reverse and remand.

I. BACKGROUND

At the preliminary examination in this matter on February 11, 2003, Kelly Corzine-Dalke testified that she lived with her friends, Andy Scoles and his wife, Amanda, in Sturgis on January 14, 2003. She and defendant had a relationship and were living together. Corzine-Dalke agreed that there were "some difficulties" between her and defendant in the days just before the incident that gave rise to the charged offenses. She indicated that she left the restaurant where she was working at about 10:00 p.m. because Andy went there and told her that Amanda had left three children, including Corzine-Dalke's son, Anthony, at the house with defendant and him although the two of them were intoxicated.

Corzine-Dalke further testified as follows about what happened when she arrived at the house:

> When I got there, [defendant] was passed out on the chair. He woke up when we got in the house. He was very intimidating. Constantly being close to me, asking me about a guy named J.J. that he had heard about from Amanda which was a friend of mine from the restaurant. Basically just being very intimidating and scaring me. And Andy went upstairs to call his parents to come pick up the kids because there was a bunch of chaos. And I followed him upstairs.

Corzine-Dalke followed Andy upstairs because she did not want to be alone with defendant, who she believed would become violent and mean when intoxicated. Corzine-Dalke said that defendant followed her and that, while Andy and she were in an upstairs bedroom where Andy was talking on the telephone, defendant grabbed her by her throat, threw her against a wall, and choked her. Andy pulled defendant off her and they all went downstairs. At some point, Corzine-Dalke said she

was going upstairs to put her son to bed. She went upstairs and called 911 and "told them that he [defendant] was going to try to kill me and I was pretty sure he was going to succeed" and then waited with her 1½-year-old son on her lap.

Thereafter, according to Corzine-Dalke, Andy and defendant went upstairs. Andy subsequently went back downstairs when there was knocking on the door. Defendant closed the door and said, "Isn't it so sad that the man you love is about ready to kill you and there's nobody here to protect you." Corzine-Dalke said that defendant "went straight for my throat, choking me, pushing me down onto the bed. I couldn't breathe. At first I was just thinking he's actually trying to kill me and then I realized that I was actually dying." She was holding her child while defendant was choking her with both hands. When asked if defendant was saying anything else, Corzine-Dalke said that "[h]e was saying that he was going to kill me" and that he said, "I'm going to kill you, bitch," a few times. She eventually tried to fight back, but defendant "still did not even lose grip" and did not get off her "until the cops pulled him off of me." When asked to describe the physical sensations she experienced, Corzine-Dalke replied:

> I was already getting dizzy. I felt like I was going to black out. In fact everything was going black right when the cops walked in the room. And I just—my life was flashing before my eyes. I was thinking about not being able to raise my son, about the fact that I couldn't believe I was actually going to die this way by him, somebody who was supposed to love me. And I just—I thought I was going to die. I thought it was over.

When asked how much time she thought elapsed from defendant choking her during this incident until the police actually got there, she replied, "It seemed like

forever. I don't even know." In response to being asked if she was able to call out to the police at all, she said, "No, I couldn't breathe, nor could I talk, nor could I scream, nor could I even get anything out. I managed to stomp on the floor."

One other witness testified at the preliminary examination. Richard Johnson, a police officer for the city of Sturgis, testified that he was called to the relevant location at about 10:30 p.m. on January 14, 2003. Officer Johnson said that he and three other police officers, all in full uniform, went into the bedroom that Corzine-Dalke described in her testimony. He also testified that, as they were ascending the stairway, he heard "some thumping noises" and a child crying. Officer Johnson also testified, as follows, about the police officers getting defendant off Corzine-Dalke:

> Officer [Gregory] Peterson had kind of put the gentleman into what is described as a full Nelson, bringing his hands up *so he could no longer choke the victim* and then yelled at her to get out and then pushed him back onto the bed and then we attempted to handcuff him.

Officer Johnson stated that defendant struggled with all four officers and offered physical resistance to each of them as he was being arrested.

## II. PROCEDURAL HISTORY

At a circuit court proceeding on May 12, 2003, which appears to be the undisputed date when the trial in this case was set to begin, counsel for the parties indicated that they had reached a plea agreement under which defendant would plead no contest to assault with intent to commit murder and resisting or obstructing a police officer. This would involve effectively consolidating the four counts of resisting or obstructing with which defendant was charged into one count. Also, the pros-

ecution agreed to dismiss an habitual offender charge. Thereafter, during questioning, defendant personally said that he understood the charges to which he was pleading no contest.

In the course of defendant's colloquy with the trial court, defendant said that he wanted to ask "something about Michigan law because I'm not from here." He then asked if there was a period during which he could withdraw his plea if he changed his mind. The trial court replied that there was not a time limit, but that "it can't be given just because you changed your mind." The trial court also said, "This is it." Then, the trial court asked defendant if he still wanted to proceed, and defendant replied, "I don't want to, but I'm going to." The trial court told him that, if he did not want to plead, "we can try it," to which defendant said, "I'm sure." The trial court then said it "would be perfectly fine," but defendant said, "We'll take it, I guess." The trial court advised defendant of various rights that he would be giving up by pleading no contest, and defendant replied affirmatively when asked if he understood those rights. Defendant replied negatively when asked if he was promised anything other than the terms of the plea agreement for his plea or if anyone had threatened him to make the plea. The trial court expressed that it was using the preliminary examination transcript as the factual basis to support the plea. In particular, the trial court read aloud excerpts from Corzine-Dalke's testimony about defendant choking her and her feeling like she was going to die and from Officer Johnson's testimony about defendant physically resisting the police officers. The trial court accepted defendant's plea.

On July 2, 2003, defense counsel filed a motion to withdraw defendant's plea. The motion stated that the reason for seeking to withdraw the plea was that

defendant "believes the victim, [Corzine-Dalke] was being coerced by the Sturgis Police and the F.I.A. [Family Independence Agency] in that if she did not testify, they would remove her minor children [sic] from her physical custody." The trial court conducted a hearing on defendant's motion to withdraw his plea on July 7, 2003. At that hearing, Corzine-Dalke testified that on January 14, 2003 (the day of the incident), she woke up defendant by using rude words and physically shaking and striking him. When asked if defendant assaulted her, including by strangling her neck, Corzine-Dalke said "we did have an argument that was physical call [sic] on both parts." In response to being asked if defendant had his hands gripping her neck to the point that she was almost passing out, she said "[t]hat was involved in a struggle between the both of us." When defense counsel asked Corzine-Dalke if she felt that defendant had tried to kill her, she replied, "I wasn't really sure what was gonna happen. I mean, we were just fighting, so—now, looking back on it, no."

The trial court referenced a letter that it received from defendant and an attached letter from Corzine-Dalke. When the trial court asked her if her description in the letter of defendant placing his hands on her neck, i.e., "your hands were on my shoulders mostly until you lost your balance and you were holding me by the neck," with the police opening the door two seconds later was accurate, Corzine-Dalke replied: "I very firmly believe that he wasn't trying to choke me, that it was just in the struggle that it happened. He was—his hands were around my neck, but I don't believe that those were his intentions." She also agreed with a quote that the trial court read from her letter in which she claimed that defendant "merely lost his balance and were [sic] holding me by the neck."

Corzine-Dalke agreed that the prosecutor and the prosecution's victims advocate requested her to be truthful in her testimony. When initially asked by the prosecutor if she was truthful in her testimony at the district court, i.e., at the preliminary examination, Corzine-Dalke said:

> Most of what I testified to—excuse me—was what I was feeling at the time. It was more emotions than any kind of facts or anything like that. There were some facts in there, but most of it was how I was feeling. Those were the questions that I was asked.

The prosecutor then asked if her answers were "truthful both as to how you were feeling and what happened," and Corzine-Dalke replied, "At the time I was still angry, and I was also scared, so for the—yes. I mean, I don't know."

Corzine-Dalke said she was afraid because she "had Child Protective Services telling me they were going to come in and take my kid away if I didn't testify against him." More specifically, she said that she was told if she did not testify against defendant that "they were going to come in and take my son away for failure to protect a child." When asked if Child Protective Services had told her to say anything that was not true, Corzine-Dalke replied, "They never said either way, no. They didn't tell me to lie." The prosecutor asked her again if she testified truthfully about what happened and how she felt at the preliminary examination, and she said, "I would assume so." Eventually, the prosecutor asked Corzine-Dalke again if everything she testified to at the preliminary examination was true, and she replied, "You asked me that a couple times." The prosecutor said that he wanted "a yes or no answer," and Corzine-Dalke then asked, "Everything I testified to as far as how I was feeling?" The trial court then interjected to

ask, "Were the facts accurate?" Corzine-Dalke replied, "Yes." She went on to state that she left out some things that were not asked of her like that she struck defendant first because she was angry. She said that "everything that I said was factual, but there was [sic, were] some certain things that were left out because they were not asked of he [sic] me." Corzine-Dalke also testified at the motion hearing that she visited defendant regularly after the preliminary examination, bought him the clothes that he wore to court, and was pregnant with defendant's child.

Before Corzine-Dalke stepped down from the witness stand at the motion hearing, the trial court stated that it was going to grant the motion to withdraw the plea. The prosecutor then asked the trial court to read the preliminary examination transcript before making that decision. The trial court responded that they were "before sentencing" and that "this is a time when if there's any question about the veracity of the plea, it's time to vacate it." However, the prosecutor stated that he had another witness he would like to call to preserve the record. The trial court then stated that its decision would be "held in abeyance until I hear all the testimony."

The prosecutor then called Linda Baker, a victim advocate in the St. Joseph County Prosecutor's Office. Baker testified that she sensed a change in Corzine-Dalke's feelings about the case over time. Initially, she was adamant that the assault with intent to murder charge not be dropped and "felt that she would have been dead if the police had not arrived when they did." However, when Corzine-Dalke found out that she was expecting a baby, she contacted Baker to ask if it would hurt the case if she personally saw defendant to tell him. Further, although Corzine-Dalke had initially wanted defendant to go to prison for a long time, she

later felt "like it wasn't necessary because he did have a lot of good qualities, and if he had hadn't [sic] been drinking, he was normally a better person than that . . . ." Baker felt that Corzine-Dalke's feelings about being pregnant were "the reason for her softening up on her feelings for what should happen."

Thereafter, the prosecutor stated that, on the date that the trial was scheduled to begin, Corzine-Dalke told defendant in the presence of defense counsel and himself that she was going to testify consistently with her preliminary examination testimony "for the reason that she owed it to other potential victims and their safety . . . ." Defense counsel agreed that was accurate. The prosecutor also stated that he would make an offer of proof that a police officer would testify that he had to pry defendant's hands off Corzine-Dalke's throat. But the trial court effectively asked if such testimony was given at the preliminary examination, and the prosecutor replied negatively. The trial court said, "All I have is the—is a varying testimony of the—of this one witness. It's clearly a matter for trial." It granted defendant's motion to withdraw his plea and entered an order vacating the plea.

On October 30, 2003, this Court granted the prosecution's application for leave to appeal the order granting defendant's motion to withdraw his plea and, on its own motion, stayed further proceedings pending resolution of this appeal.

### III. ANALYSIS

#### A. STANDARD OF REVIEW

The sole issue on appeal is whether defendant was erroneously permitted to withdraw his no-contest plea before sentencing where the alleged victim recanted her

preliminary examination testimony. We review for an abuse of discretion. *People v Wilhite,* 240 Mich App 587, 594; 618 NW2d 386 (2000). A trial court abuses its discretion when an unprejudiced person, considering the facts on which the trial court acted, would conclude that there was no justification or excuse for the ruling. *People v Ullah,* 216 Mich App 669, 673; 550 NW2d 568 (1996).

### B. WITHDRAWAL OF NO-CONTEST PLEA

Defendant's nolo contendere plea is an admission of all the essential elements of a charged offense and, thus, is tantamount to an admission of guilt for the purposes of the criminal case. *People v New,* 427 Mich 482, 493 n 10; 398 NW2d 358 (1986). There is no absolute right to withdraw a guilty plea once the trial court has accepted it. *People v Davidovich,* 238 Mich App 422, 425; 606 NW2d 387 (1999). Because defendant moved to withdraw his plea before sentencing, MCR 6.310(B) controls and provides the circumstances under which he may withdraw his plea:

> On the defendant's motion or with the defendant's consent, the court in the interest of justice may permit an accepted plea to be withdrawn before sentence is imposed unless withdrawal of the plea would substantially prejudice the prosecutor because of reliance on the plea. If the defendant's motion is based on an error in the plea proceeding, the court must permit the defendant to withdraw the plea if it would be required by MCR 6.311(B).[1]

To support withdrawal of a plea "in the interest of justice" under MCR 6.310(B), a defendant has the burden of establishing " 'a fair and just reason for withdrawal of the plea.' " *Wilhite, supra* at 597, quoting

---

[1] Defendant did not allege error in the plea proceeding; therefore, the second sentence of the court rule is inapplicable.

*People v Jackson*, 203 Mich App 607, 611; 513 NW2d 206 (1994). If defendant meets that burden, then the prosecution has the burden of showing that substantial prejudice would result from allowing withdrawal of the plea. *Wilhite, supra* at 597.

As an initial matter, the record shows that the trial court did not apply the correct legal standard in ruling on defendant's motion to withdraw his plea because it failed to consider defendant as having the burden of establishing a fair and just reason for withdrawal. The trial court never mentioned defendant having this burden. Rather, in initially expressing that it would allow withdrawal of defendant's plea after Corzine-Dalke's testimony at the motion hearing, the trial court indicated that withdrawal of the plea was appropriate if there was "any question" about the veracity of the plea.[2] Thus, instead of requiring defendant to *establish* a fair and just reason for withdrawal of his plea, the trial court effectively concluded that it was enough for defendant to merely raise a question about the plea. Further, the trial court never addressed the question of whether withdrawal of the plea should be precluded because withdrawal would substantially prejudice the prosecution, even though the prosecutor effectively argued that point at the hearing by asserting that defendant's actions in persuading Corzine-Dalke to testify in his favor would make it "very difficult or impossible for the prosecution to prove its case . . . ."

---

[2] The trial court may have improperly assessed the motion to withdraw under the old "great liberality" standard. Under this standard, which applied before October 1, 1989, a trial court was required to allow withdrawal of a plea before sentencing unless the reasons advanced for withdrawal were clearly frivolous or motivated by dissatisfaction with a probable sentence. See *People v Gomer*, 206 Mich App 55, 56-57; 520 NW2d 360 (1994). In adopting MCR 6.310(B), our Supreme Court discarded the "great liberality" standard. *Gomer, supra* at 57.

Nevertheless, assuming that the trial court made its decision pursuant to MCR 6.310(B), the question is whether defendant articulated a "fair and just reason" warranting withdrawal of his plea. Although defendant cited alternative bases in his letter to the trial court for withdrawing his plea,[3] the only reason stated in his motion was that Corzine-Dalke recanted her preliminary examination testimony, asserting that she had been coerced by the Sturgis Police Department and the FIA into testifying against defendant. Therefore, in essence, defendant argued that there was insufficient evidence to find a factual basis for his plea because Corzine-Dalke's recanted testimony cast doubt on the intent element of his conviction of assault with intent to commit murder.[4]

We have not found any published Michigan case law dealing with a motion to withdraw a no-contest plea in light of recanted testimony. However, in the context of a guilty plea, this Court has held that a defendant's motion to withdraw his plea based on a promise of leniency "must allege some support for the defendant's claim other than the defendant's mere postconviction statement . . . ." *People v Sledge (On Rehearing)*, 200 Mich App 326, 328; 503 NW2d 672 (1993). "To prevail on the motion, 'the motion and its supporting affidavits and proofs must satisfy the trial court by a preponderance of

---

[3] Defendant stated that he was shocked when, on the day of the trial, the same day he entered his plea, Corzine-Dalke decided not to testify on his behalf. Not having another defense prepared, defendant felt pressured into taking the plea agreement by both the prosecution and his counsel. Yet none of these reasons was raised before the trial court at the motion hearing.

[4] In the case of a plea of nolo contendere, the standard to be applied by an appellate court in its review of the adequacy of factual bases for a plea is whether the trier of fact could properly convict on the facts elicited from reliable sources. *People v Booth*, 414 Mich 343, 360; 324 NW2d 741 (1982).

credible evidence that the plea was the product of fraud, duress, or coercion.' " *Id.* at 329, quoting *People v Taylor*, 383 Mich 338, 361; 175 NW2d 715 (1970). In keeping with this standard, we believe that for recanted testimony, which provided a substantial part of the factual basis underlying a defendant's no-contest plea, to constitute a fair and just reason for allowing the defendant to withdraw his plea, at a minimum, the defendant must prove by a preponderance of credible evidence that the original testimony was indeed untruthful. If the defendant meets this burden, the trial court must then determine whether other evidence is sufficient to support the factual basis of the defendant's plea. If the defendant fails to meet this burden or if other evidence is sufficient to support the plea, then the defendant has not presented a fair and just reason to warrant withdrawal of his no-contest plea. Even if the defendant presents such a fair and just reason, prejudice to the prosecution must still be considered by the trial court. *Wilhite, supra* at 597. We hold that, in this case, defendant has failed to prove by a preponderance of credible evidence that Corzine-Dalke's preliminary examination testimony was untruthful.

In accepting defendant's no-contest plea, the trial court relied on the preliminary examination testimony to establish support for finding defendant guilty of the offenses to which he pleaded. MCR 6.302(D)(2); *People v Wiggins*, 151 Mich App 622; 390 NW2d 740 (1986) (the factual basis for a plea of nolo contendere may be established by reference to a preliminary examination transcript). Corzine-Dalke's testimony at the preliminary examination was emphatic and unequivocal regarding the circumstances on the night of the incident and her belief that defendant was trying to kill her. At the motion hearing, the only significant change in Corzine-Dalke's testimony was that she denied defen-

dant was choking her and that she thought she was going to die as a result. Rather, she claimed that defendant was simply "holding" her by the neck because he lost his balance and the police happened to arrive "two seconds later." This is in stark contrast to her preliminary examination testimony in which she stated that defendant went directly for her throat and it seemed defendant was choking her "forever" before the police finally arrived.

While no Michigan authority has dealt directly with a witness recanting incriminating testimony against a defendant in the context of a motion to withdraw a no-contest plea, in the context of a motion for a new trial, recantation testimony is regarded with suspicion. In particular, when evaluating a motion for a new trial based on the basis of newly discovered evidence, this Court has stated that "where newly discovered evidence takes the form of recantation testimony, it is traditionally regarded as suspect and untrustworthy." *People v Canter*, 197 Mich App 550, 559; 496 NW2d 336 (1992). Accordingly, "Michigan courts have expressed reluctance to grant new trials on the basis of recanting testimony." *Id.* at 560. In *Canter*, the Court held that the trial court did not abuse its discretion in denying the defendant's motion for new trial because he did not clearly establish the veracity of the witness's recanting testimony or the falsity of her trial testimony. We see no reason recanted testimony should be viewed with less suspicion in the context of a motion to withdraw a no-contest plea after it has been accepted by the trial court.

At the motion hearing, a victim advocate testified that she sensed a change in Corzine-Dalke's feelings about the case over time. Initially, the witness was adamant that the charges not be dropped and she wanted defendant to go to prison for a long time. However, when Corzine-Dalke found out that she was

expecting defendant's baby, her feelings softened. Defendant presented no evidence to substantiate a claim of coercion by the Sturgis Police Department or the FIA. Indeed, the fact that Corzine-Dalke was told of the possibility of losing custody of her child if she did not testify truthfully against defendant was an incumbent responsibility of these government agencies.[5] Corzine-Dalke admitted at the motion hearing that no one had told her to lie at the preliminary examination and was expressly told to testify truthfully. Despite initially being extremely equivocal about the veracity of that testimony, Corzine-Dalke admitted that the facts she testified about at the preliminary examination were accurate and she had testified truthfully at that hearing. Considering the substance of Corzine-Dalke's recantation testimony, which was equivocal at best, in light of circumstances under which it was made, we find that defendant has failed to prove by a preponderance of credible evidence that Corzine-Dalke's preliminary examination testimony was untruthful, particularly given Officer Johnson's preliminary examination testimony that clearly supported Corzine-Dalke's original description of the offense and defendant's intent. Because we find that the trial court could not reasonably have granted the motion to withdraw, we reverse the trial court's order instead of remanding for reconsideration of the motion to withdraw under the correct legal standard.[6]

---

[5] *People v Richter*, 54 Mich App 598; 221 NW2d 429 (1974), cited by defendant, is completely distinguishable on its facts because in that case the threat to remove the defendant's children was applied directly to the defendant to obtain a confession. Defendant in this case does not claim that he pleaded guilty in order to avoid having Corzine-Dalke's child removed from her custody.

[6] We recognize that in most cases where the trial court fails to employ the correct standard a remand will be necessary because of the credibility issues. *Canter, supra* at 560. However, the facts of this case are sufficiently unusual such that a remand is not warranted.

Accordingly, we vacate the trial court's order permitting defendant to withdraw his plea and remand for reinstatement of defendant's plea and direct the trial court to proceed with sentencing. We do not retain jurisdiction.